**EMONS INDUSTRIES, INC., Plaintiff,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY and Reserve Insurance Company, Defendants.**

**No. 75 Civ. 3227 (KTD).**

United States District Court, S. D. New York.

July 19, 1982.

Slade, Pellman & Biehl, New York City, for plaintiff; Frederick R. Biehl, John F. Triggs, Anthony P. Coles, New York City, of counsel.

A. Paul Goldblum, Brooklyn, N. Y., and Dinsmore, Shohl, Coates & Deupree, Cincinnati, Ohio, Christopher C. Mansfield, Boston, Mass., for defendant Liberty Mut.; Gerald V. Weigle, Jr., Janet R. Eaton, Cincinnati, Ohio, of counsel.

Kornstein, Meister & Veisz, New York City, for defendant Reserve Ins. Co.; Daniel J. Kornstein, New York City, of counsel.

MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

In this diversity action, Emons Industries, Inc. ("Emons") seeks a declaratory judgment holding that Liberty Mutual Fire Insurance Company ("Liberty") and Reserve Insurance Company ("Reserve") are con-

tractually obligated to indemnify Emons for product liability arising from the sale of a pharmaceutical product known as Diethylstilbestrol or, more commonly, DES. In 1979, I granted partial summary judgment in favor of Emons holding that Liberty and Reserve were each liable for fifty percent of the cost of defending the product liability lawsuits against Emons. *Emons Industries, Inc. v. Liberty Mutual Fire Ins. Co.*, 481 F.Supp. 1022 (S.D.N.Y.1979). Since that time the parties have attempted to settle the case but without success. Liberty now moves for summary judgment on the issue of indemnity for Emons' product liability, and Reserve moves to dismiss for lack of subject matter jurisdiction or in the alternative for a stay due to its recent placement in receivership. After providing some background to the issues in this case, each of these motions will be discussed in order.

DES is a synthetic estrogen which was commonly used during the 1950's and early 1960's by pregnant women to prevent miscarriage. Emons first distributed the drug in 1945.[1] In 1947, the Food & Drug Administration ("FDA") formally approved of its use by pregnant women. Mounting medical evidence, however, compelled the FDA to ban this use of DES in 1971. This evidence suggested that DES may cause cancer in the female offspring of women who ingested it during pregnancy. Consequently, women afflicted with cancer thought to be caused by DES, and their mothers who ingested the drug, brought suit around the country against the various manufacturers of DES, including Emons. According to Liberty, one of Emons' insurers over the past half century, at least thirteen plaintiffs have brought claims against Emons. These plaintiffs or their mothers apparently ingested DES at times between 1952 and 1963.[2]

After the commencement of the actions by these plaintiffs against Emons, Emons requested that two of its insurers, Liberty and Reserve, defend it and reimburse it for any judgments or settlements against it. My prior opinion in this action addressed the defendants' duty to defend Emons. 481 F.Supp. 1022 (S.D.N.Y.1979). The parties subsequently agreed that this action was to be held in abeyance until such time as a judgment was obtained against Emons in the product liability suits or until there has been a settlement without agreement between the insurers as to who should pay any settlement costs. Emons recently settled a case for $25,000,[3] and after Liberty refused to reimburse Emons, Emons requested by letter to me dated June 23, 1981 that this action be removed from the suspense calendar. The instant motions address, *inter alia*, the ultimate issue in this case, namely, whether Liberty and Reserve are liable for indemnification of Emons.

1. Emons operated its pharmaceutical business under the name Amfre-Grant, Inc. from 1945 until 1971. Emons sold its entire pharmaceutical business and the trade name Amfre-Grant in 1971.

2. The affidavit of William Upham, an employee of Liberty, states as follows:

    The following is a list of the known claims against Emons Industries/Amfre-Grant to date and the date(s) of ingestion for each claim as determined by the complaint on discovery:

| Plaintiff | Dates of Ingestion |
| --- | --- |
| Spivev | Late 1959 through March, 1960 |
| Gauldin | June, 1954 through March 27, 1955 |
| Rubio | November, 1960 through July 24, 1961 |
| Noto | May, 1958 through November, 1958 |
| Afholter | 1958 |
| Collins | 1957 through early 1958 |
| Hall | 1957 through early 1958 |
| Felt | 1959 |
| Ferrigno (Mannix) | 1952 through mid 1953 |
| Develhymer | December 28, 1956 through July, 1957 |
| Sochanchak | August, 1954 through May, 1955 |
| Brods | 1963 |
| Kirk | August, 1960 to March, 1961 |

    It is not clear from the record before me when the alleged injuries incurred by each of these plaintiffs first manifested themselves.

3. In April, 1981, Emons settled one of the DES lawsuits against it, *Spivey v. Eli Lilly*, No. 1,043,449, District Court of Harris County, 129th Judicial District, Texas.

## I.

It is undisputed that Liberty insured Emons from 1945 until 1970. Thereafter, Emons was insured by several other companies, one of which was Reserve. Liberty argues, however, that the coverage afforded to Emons prior to 1964 did not include products liability coverage. Liberty admits that it covered Emons for products liability from 1964 to 1970, but it asserts that Emons was issued only general coverage prior to that time. Because the diseases which form the basis of the claims against Emons either manifested themselves after 1970 or were the result of ingestions prior to 1964, Liberty submits that it is not liable to Emons for judgments or settlements obtained in any DES action against Emons.

Liberty's argument is predicated on Emons' purported failure to meet its burden of proving the terms and provisions of the policies upon which it sues. Emons' ability to provide this proof has been all but eliminated by the unexplained destruction of the insurance policies in existence prior to 1964. Liberty asserts that it has made repeated efforts to locate records of the old policies but without success. Urmston Affidavit. Moreover, Liberty argues that it was unusual prior to 1960 for a business insured by Liberty to purchase products liability coverage as part of a general liability program of insurance. Purkis Affidavit ¶ 2. Finally, Liberty argues that any products liability insurance that was extended to Emons prior to 1964 must have had limits, which in all probability have been used up. Liberty asserts that Emons has not offered any proof to show that the policy limits have not already been consumed.

Emons' response to these arguments is two-fold: (i) evidence exists in the record to show that in fact Liberty issued products liability insurance to Emons prior to 1964, and (ii) in any case, Liberty, not Emons, has the burden of showing that the comprehensive liability policy in existence prior to 1964 did not also include products liability coverage. Relying on these arguments, Emons cross-moves for summary judgment.

Emons has presented evidence which tends to show that it had products liability coverage prior to 1964 from Liberty. Significant is the affidavit of Lewis Stein, the president of Emons between 1945 and 1970, who proclaims: "I can state with certainty that from that date [1945] forward we never had less than $150,000 of product liability insurance ...." Stein Affidavit ¶ 5. Another probative piece of evidence is a survey prepared by a Liberty claims inspector in 1961. It may be presumed that this survey report was used by Liberty to assess any risk involved in insuring Emons for products liability, and as such, it tends to rebut Liberty's assertion that no coverage existed. The survey states: "This inspection was prompted primarily by the assured's [Emon's] desire to increase his present products liability coverage." Biehl Affidavit, Exhibit F. Other evidence, consisting of policies issued by Liberty to Emons after 1964, suggests that products liability coverage existed prior to that year.

This proof creates genuine issues of material fact sufficient to defeat Liberty's motion for summary judgment on the issue of whether products liability coverage existed prior to 1964.

Liberty asserts that despite this proof Emons has not met its burden of proving the applicable limits of any coverage it might have had. Evidently, the aggregate limit on any comprehensive policy to Emons —Mr. Stein recalled a $150,000 limit—is unrelated to the amount of insurance which is available for any one product claim. Urmston Affidavit, 3/4/82. According to Liberty, any policy which includes products liability coverage has three limitations: a per person limit, a per accident limit and an aggregate limit. As a result, knowing only the aggregate limit does not reveal how much insurance is available for any one claim.

Plaintiff has submitted a "Statistical Data Card" obtained from Liberty's files which summarizes information shown on the Liberty rate cards and policies. It reveals that in 1945 Emons' limits were "50/150/150" ($50,000 per person, $150,000

per accident, $150,000 yearly aggregate), and "10/20/150" in 1949. No per person or per accident limits, however, are provided for the years 1951 through 1964. This lack of proof, urges Liberty, entitles it to summary judgment because Emons has the burden to prove all the terms and conditions of any coverage.

There is no dispute among the parties that the limits of any insurance coverage afforded Emons is governed by New York law.[4] New York, like most jurisdictions, places upon plaintiff in an action based on an insurance contract the burden of proof to establish the existence of the policy sued upon and the provisions upon which the suit is based. *Lapierre, Litchfield & Partners v. Continental Casualty Co.*, 59 Misc.2d 20, 23, 297 N.Y.S.2d 976, 979 (1969), *modified on other grounds and affirmed*, 32 A.D.2d 353, 302 N.Y.S.2d 370 (1st Dep't 1969). Liberty asserts that Emons may not rest on the proof it has presented but rather must show two crucial facts: first, that products liability coverage existed prior to 1964, and second, the specific limits of that coverage.

Liberty relies for support upon a case brought in the District Court for the District of Columbia, *Keene Corporation v. Insurance Co. of North America*, 513 F.Supp. 47, (D.C.D.C.1981) (Green, D. J.). *See* Defendant's Exh. 4. In *Keene*, the plaintiff, a manufacturer of asbestos products, sought declaratory relief against several insurance carriers holding them obligated to defend and indemnify plaintiff in lawsuits brought against it by persons injured by plaintiff's asbestos products. Similar to the circumstances in this case, the insurance policy in question was lost. Applying Pennsylvania law, the district court reasoned that "[the plaintiff] Keene bears the burden of proof to show by clear and convincing evidence that the insurance policies existed and covered these suits." Slip op. at 1. The court concluded that Keene had not met this burden and granted summary judgment for the defendant.

Keene's proof included index cards which showed that Keene was covered from 1948 to 1959 by a Comprehensive General Liability ("CGL") policy issued by a Pennsylvania insurer. The standard policy forms used by the insurer stated that "the insurance afforded is only with respect to such and so many of the following coverages as are indicated by specific premium charge or charges." *See id.* at 1–2. Evidently, not until 1955 did these policies include in its standard form a provision for products coverage. No direct proof existed, however, to show that Keene's policies with the insurer included products liability coverage. In the face of this lack of proof, the defendant insurer presented proof that irrespective of the CGL forms used from 1948 to 1959, a separate premium charge is made for products liability and noted on the contracts declaration page. The defendant insurer presented a document which summarized the declarations page for the 1958–59 policy and which explicitly stated that products coverage was excluded. In light of this evidence the district court rejected Keene's argument that because the standard CGL policies used by the defendant insurer sometimes made products liability coverage mandatory that the burden therefore shifted to the insurer to show that products liability coverage was explicitly excluded. On appeal summary judgment was upheld unless Keene could present additional evidence to show that it had products liability coverage. *Keene v. Ins. Co. of North America*, 672 F.2d 895 (D.C.Cir.1981). Defendants' Exhibit 5.

In the case at bar, Emons' proof of products liability coverage is more compelling than that presented by Keene, and Liberty's proof in opposition is far less convincing than that of the insurer in *Keene*. The Stein affidavit submitted by Emons is evidence that not only did Liberty provide Emons with products liability insurance from 1945 to 1970 but also that the aggregate limit on such coverage was $150,000.

---

4. The insurance policies which Liberty issued to Emons, a New York corporation, were ap-

parently signed and delivered in New York.

Also, as earlier stated, Emons submitted a loss prevention survey completed in 1961 (Plaintiff's Exhibit F) which discusses an increase in "present Product Liability coverage" up to "250/500,000." Although this does not definitively pinpoint the amount of products liability coverage in existence prior to 1964, it is evidence which creates a material question of fact on the issue of coverage.

Liberty cannot rest upon its bald assertion that Emons carries the burden of proving any products liability coverage to obtain summary judgment. Liberty repeatedly argues that it cannot locate the comprehensive general policy in existence prior to 1964 and that there is no definite proof of there being a products liability coverage much less any proof of the limits to such coverage. Some evidence in the record exists, however, to establish not only that products liability coverage existed but also that the limits to such liability were within a certain range. Furthermore, New York law places the burden of proof upon the insurance company to show any exclusions. *See Sincoff v. Liberty Mutual Fire Ins. Co.*, 11 N.Y.2d 386, 230 N.Y.S.2d 13, 183 N.E.2d 899 (1962); *Danerhirsch v. Travelers Indemnity Co.*, 202 App.Div. 207, 195 N.Y.S. 110 (1st Dep't 1922). The limitations on liability placed in question by Liberty may arguably be considered such an exclusion. Thus, although plaintiff's proof is not so definitive to permit granting plaintiff's cross-motion for summary judgment, it certainly creates material questions of fact dictating a denial of defendants' motion for summary judgment.[5]

## II.

I will now turn to Reserve's motion for an order dismissing or staying this action as to them. Reserve is an Illinois insurance corporation subject to the supervision of the Illinois Department of Insurance. It insured Emons for products liability for one year from November, 1970 to November, 1971. On May 29, 1979, an order of the Circuit Court of Cook County, Illinois, (Reserve's Exh. A) found Reserve to be insolvent and placed it in liquidation pursuant to the Uniform Insurers Liquidation Act of Illinois, Ill.Rev.Stat. ch. 73, §§ 833.1—833.13 ("Uniform Act"). That same court on May 16, 1979 had appointed the Director of Insurance of the State of Illinois as liquidator of Reserve. The Uniform Act, which has also been adopted by New York State,[6] *see* N.Y.Ins.Law §§ 517—524 (McKinney 1966), provides that any claims against an insurance company in liquidation must be adjudicated in either the domiciliary state of the insurance company or in a state that has adopted the Uniform Act if an ancillary receiver has been appointed there.[7] The

---

5. Denial of defendants' summary judgment motion and plaintiff's cross-motion leaves standing the issue of whether the ingestion theory or manifestation theory of liability should govern this case. Since neither Liberty's nor Emons' motion was premised upon the relative merits of these two theories, I will not address this issue at this time.

6. To date, 31 states have adopted the Uniform Insurers Liquidation Act. *See* 13 Uniform Laws Ann. [Master ed.], p. 429.

7. N.Y.Ins.Law § 521, which is identical to The Uniform Act, provides in pertinent part:

1. In a delinquency proceeding in a reciprocal state against an insurer domiciled in that state, claimants against such insurer who reside within this state may file claims either with the ancillary receiver, if any, appointed in this state, or with the domiciliary receiver. All such claims must be filed on or before the last date fixed for the filing of claims in the domiciliary delinquency proceeding.

2. Controverted claims belonging to claimants residing in this state may either (a) be proved in the domiciliary state as provided by the law of that state, or (b), if ancillary proceedings have been commenced in this state, be proved in those proceedings. In the event that any such claimant elects to prove his claim in this state, he shall file his claim with the ancillary receiver in the manner provided by the law of this state for the proving of claims against insurers domiciled in this state, and he shall give notice in writing to the receiver in the domiciliary state, either by registered mail or by personal service at least forty days prior to the date set for hearing. The notice shall contain a concise statement of the amount of the claim, the facts on which the claim is based, and the priorities asserted, if any. If the domiciliary receiver, within thirty days after the giving of

Uniform Act serves the purpose of providing a "uniform, orderly and equitable method of making and processing claims against [a] defunct insurer ...." *Vlasatv v. Avco Rent-A-Car System, Inc.*, 60 Misc.2d 928, 930, 304 N.Y.S.2d 118, 120 (Sup.Ct.1969). Since Reserve is an Illinois insurer and an Illinois receiver has been appointed there, no suits against it may be entertained in New York unless a New York receiver has also been appointed. Unfortunately, no New York receiver has been appointed, and for this reason, Reserve has successfully requested courts to dismiss or stay actions brought against Reserve both before and after it went into receivership. *See, e.g., G. C. Murphy Co. v. Reserve Ins. Co.*, 74 A.D.2d 235, 427 N.Y.S.2d 800 (1st Dep't 1980), *modified on other grounds and aff'd*, 54 N.Y.2d 69, 444 N.Y.S.2d 592, 429 N.E.2d 111 (1981) (action stayed); *Lopez v. Yosemite Ins. Co.*, Index No. 10020/1980, Sup.Ct. Kings Co., Oct. 30, 1980 (action dismissed); *Deepdale General Hospital v. Reserve Ins. Co.*, Index No. 11304/1978, Sup.Ct. Queens Co., Dec. 20, 1980 (action stayed).

Emons has not submitted any response to Reserve's instant motion. Liberty, however, has responded in the form of a motion for an order (i) striking Reserve's answer because of Reserve's failure to post a bond under N.Y.Ins.Law § 59–a and entering a default judgment on Liberty's cross-claim against Reserve, or alternatively (ii) directing Reserve to file a bond.

Section 59–a of the New York Insurance Law provides a basis for jurisdiction to be obtained in New York courts over foreign insurers who are unauthorized to do business in New York but who nevertheless conduct business here.[8] Reserve has never been licensed to do business in New York as an insurer although the policy with Emons was apparently entered into here. Section 59–a provides that "[b]efore any unauthorized foreign or alien insurer shall file or cause to be filed any pleading in any action ... against it, such unauthorized insurer shall either (i) deposit with the clerk of the court in which such action is pending, cash as securities or ... a bond ... in an amount sufficient to secure the payment of any final judgment ...." N.Y.Ins.Law § 59–a(3). Thus, Section 59–a serves the purpose of protecting New Yorkers who are insured by unauthorized foreign insurers from the "often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies." *Id.*

This lawsuit was commenced on July 1, 1975. Reserve answered on August 18, 1975. This answer contained a counterclaim against Emons, which has since been withdrawn, and a cross-claim against Liber-

such notice, shall give notice in writing to the ancillary receiver and to the claimant, either by registered mail or by personal service, of his intention to contest such claim, he shall be entitled to appear or to be represented in any proceeding in this state involving the adjudication of the claim. The final allowance of the claim by the courts of this state shall be accepted as conclusive as to its amount, and shall also be accepted as conclusive as to its priority, if any, against special deposits or other security located within this state.

**8.** The purpose of N.Y.Ins.Law § 59–a (McKinney's 1966) is described in the statute as follows:

1. The purpose of this section is to subject certain insurers to the jurisdiction of the courts of this state in suits by or on behalf of insureds or beneficiaries under certain insurance contracts. The legislature declares that it is a subject of concern that many residents of this state hold policies of insurance issued or delivered in this state by insurers while not authorized to do business in this state, thus presenting to such residents the often insuperable obstacle of resorting to distant forums for the purpose of asserting legal rights under such policies. In furtherance of such state interest, the legislature herein provides a method of substituted service of process upon such insurers and declares that in so doing it exercises its power to protect its residents and to define, for the purpose of this section, what constitutes doing business in this state, and also exercises powers and privileges available to the state by virtue of public law number fifteen, seventy-ninth Congress of the United States, chapter twenty, first session, senate number three hundred forty, as amended, which declares that the business of insurance and every person engaged therein shall be subject to the laws of the several states.

ty. Liberty argues now that Reserve's answer should be stricken. Pointing out that Reserve's liquidation did not occur until May, 1979, after Reserve had actively involved itself in this litigation, Liberty urges that Reserve cannot now hide behind its receivership and avoid its obligations under the insurance laws and the purpose of Section 59–a to protect New York insureds.

■ Liberty's arguments must be rejected. The New York Court of Appeals has recently held that where a claim is asserted in a New York action against a foreign insurer which is in receivership but where no ancillary receiver has been appointed in New York, that claim must be adjudicated in the insurer's domiciliary state even though it is secured by an undertaking under Section 59–a of the Insurance Law. *G. C. Murphy Co. v. Reserve Insurance Co.*, 54 N.Y.2d 69, 444 N.Y.S.2d 592, 429 N.E.2d 111 (1981). Thus, Liberty has no special right to proceed against a fund under Section 59–a where Reserve is in receivership. Here, Reserve has not made such a deposit in compliance with the statute. Nevertheless, it is apparent from the *G. C. Murphy* case that the New York Courts have placed great emphasis on the important policies underlying the Uniform Liquidation Act. In the words of New York State's highest court,

We are not unmindful that the purpose of section 59–a of the Insurance Law is to provide New York residents with meaningful recourse to the courts of this State without having to pursue their claims against foreign unauthorized insurers in distant forums. Nonetheless, the Legis-

lature has specifically provided that to the extent that provisions of the Uniform Insurers Liquidation Act, when applicable, conflict with other provisions of the Insurance Law, the provisions of the uniform act control. (Insurance Law, § 524, subd. 2.) We are also cognizant of the individual hardship suffered by the present plaintiff, who has been in the throes of litigation for the past seven years and now must pursue its claim in the distant forum of Illinois. By enacting the Uniform Insurers Liquidation Act, our Legislature has determined that such occasional instances of adversity are outweighed by the paramount interest of the various States in seeing that insurance companies domiciled within their respective boundaries are liquidated in a uniform, orderly and equitable manner without interference from external tribunals. (footnotes omitted)

Therefore, both Emon's and Liberty's claims against Reserve must be stayed.[9] The consequences of Reserve's noncompliance with Section 59–a will be addressed at such time as the stay can be lifted. Meanwhile, Liberty's argument that despite the Uniform Act, Reserve's answer should be stricken now is unavailing at this late date, nearly six years after the answer was filed.

Accordingly, Liberty's motion to strike is denied subject to renewal at an appropriate time in the future. Also, Reserve's motion for a stay pending liquidation proceedings is granted.

This case is to be placed on the Suspense Docket of this court.

SO ORDERED.

---

9. Liberty insists that it is entitled to a default judgment on the basis of a 1951 case decided in this district, *Ace Grain Co. v. American Eagle Fire Insurance Co.*, 95 F.Supp. 784 (S.D.N.Y. 1951) (motion to quash service on defendant insurer denied); 11 F.R.D. 364 (S.D.N.Y.1951) (motion for default judgment against insurer granted). In that case, a Rhode Island insurer not licensed in New York was sued in this court. The insurer never answered the complaint because after the action was commenced the insurer became insolvent and a liquidator appointed. In addition, a Rhode Island court forbade the insurer to post a bond in New York. The district court held the insurer in

default. Several facts distinguishes *Ace Grain* from the situation at bar. First, *Ace Grain* was decided nearly thirty years prior to the New York Court of Appeals pronouncement in *G. C. Murphy* that the Uniform Act will govern any inconsistencies with Section 59–a. Second, the plaintiff in *Ace Grain* objected *before* an answer was filed to the insurers failure to post a bond, whereas in this case plaintiff objected six years *after* an answer was filed. Finally, unlike Reserve, the insurer in *Ace Grain* was not declared insolvent. This fact makes it more difficult legally and financially for Reserve to comply with Section 59–a.