**NEW HAMPSHIRE BALL BEARINGS**

v.

**AETNA CASUALTY, et al.**

No. C–87–457–L.

United States District Court,
D. New Hampshire.

April 1, 1994.

Paul F. Ware, Jr., Goodwin, Procter & Hoar, Boston, MA, for intervenor Eastern Mt.

Michael C. Harvell, Sheehan, Phinney, Bass & Green, P.A., Portsmouth, NH, for plaintiff.

Stephen H. Roberts, Ouellette, Hallisey, Dibble & Tanguay, Dover, NH, Susan Kennedy, Drinker, Biddle & Reath, Washington, DC, Richard C. Nelson, Nelson, Kinder, Mosseau & Gordon, PC, Manchester, NH, for defendants.

## ORDER

LOUGHLIN, Senior District Judge.

This is a suit for declaratory judgment and indemnification under several comprehensive general liability policies which were issued by the two insurance company defendants, Aetna Life & Casualty and American Motorists Insurance Company, from about 1971 through 1983 to recover the costs of cleaning up hazardous waste contamination at the New Hampshire Ball Bearings Peterborough site.

## BACKGROUND

New Hampshire Ball Bearings ("NHBB") is under orders from the Environmental Protection Agency ("EPA") and is also being supervised by the New Hampshire State Department of Environmental Services in cleaning up the hazardous waste contamination, and it has been determined that NHBB is the responsible party. Other potentially responsible parties have not been found.

NHBB was formed in 1946 by Arthur Daniels who had previously entered the miniature ball bearing business in the late nineteen thirties in Lebanon and Keene, New Hampshire. After service in the United States Navy during the second World War, Mr. Daniels started NHBB in Peterborough. After ten years in various small plants in downtown Peterborough, NHBB bought a 27–acre farm property on the westerly side of Route 202, Peterborough, New Hampshire.

The principal business of NHBB was the manufacture of miniature precision ball bearings for use in the aerospace industry and in a number of other occupations but principally the aerospace industry.

American Motorists Insurance Company policies ("AMICO") were extant from the year 1972 to 1980. The AMICO umbrella liability policy number 4SB002033 effective from February 21, 1974 to February 21, 1977, contains a standard pollution exclusion clause which excludes coverage for property damage caused by pollution except where the property damage is caused by a "sudden and accidental" discharge of pollutants. *See* plaintiff's exhibit 270.

Subsequent to the issuance of the binder, AMICO issued umbrella liability policy 7SB002033, effective from March 31, 1977 to March 31, 1978, which contained the same terms and conditions as policy 4SB002033. The evidence shows that the AMICO umbrella policies from February 21, 1974 through February 20, 1979 all contained the standard pollution exclusion clause. That clause excepts from coverage all pollution related property damage except when the discharge causing the pollution condition was both "sudden and accidental."

Aetna Insurance policies were extant from July, 1980 through July 1, 1983. Aetna issued NHBB a series of primary and excess liability policies during the policy period.

The primary issue in this case is whether the Aetna and AMICO so-called "form policies" provide coverage to NHBB for the costs of cleaning up hazardous wastes contamination caused by the insured. Both policies are based on either the 1966 Standard Form Comprehensive General Liability ("CGL") policy or the 1973 Standard Form CGL policy.

Another disputed issue is whether the claims of NHBB arose out of the contamination of its own property and are thereby excluded from coverage. Contiguous areas and the pollution of the south well by its discharge of hazardous industrial wastes are covered. All policies at issue contained the following exclusions:

Exclusion "a", which excludes from coverage any liability assumed by the insured under any contract or agreement.

Exclusion "k", which excludes any claim based on "property damage" to premises owned, occupied, rented or used by the insured.

Exclusion "c" the pollution exclusion, which excludes any claim based on:

Bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of

water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

There are other issues which the court will address if they are apposite and if the court deems these issues should be reached in deciding this case.

NHBB was successful and expanded throughout the 1960's and seventies. There were additions built in 1956, 1960, 1966, 1978, and 1980. The Peterborough facility reached a high of about 700 employees in the early nineteen eighties.

It appears that awareness of the contamination of the South Well of the Town of Peterborough occurred in October of 1982 after investigation by the State of New Hampshire. A routine sample of the South Well taken by the State of New Hampshire resulted in the discovery of concentrations of Volatile Organic Compounds ("VOC"). The VOC's were identified as 1, 1, 1 tricholoroethane ("TCA") and trichloroethylene ("TCE"). This discovery led to an investigation of NHBB to ascertain whether or not it was the source. The NHBB plant is approximately one quarter mile west of the South Well.

Solvents are critical to the manufacturing process; solvent use is essentially for the purpose of removing oil that had adhered to the surface of the parts during the turning or grinding operations as well as the heat treat operation.

The evidence disclosed that cleaning ball bearings is very important; the rings are washed with solvents which dissolve traces of oil. The spent solvents have to be disposed of. Floors have to be washed frequently because they become oily from accidental discharges and quite slippery. In its manufacturing process, NHBB uses degreasing agents or products to dissolve cutting oils used for lubrication. NHBB used VOCs such as TCA and TCE as degreasing agents.

In the manufacturing process, the following would happen. The raw materials were placed in the steel storage area. They would move to the screw machine area where there was a degreasing operation and then on to the heat treat area where there was a TCA washer, a vapor degreaser, then on to the face-lap grind area where there was a parts washer or degreaser located on the grinding floor; then on to the centerless grind which used the same washer as the face-lap. From the centerless grind it would move on to the bore grind to the inner track grind to the tumble area, to the finish track grind to the passivation area, to the finish parts area to the gaging and washing area to the assembly area and final bearing inspection. There were some degreasing and washing activities in the assembly and final bearing inspection areas. When full, industrial wastes and solvents would flow through a discharge pipe into a brook located on the north side of the NHBB building. Its flow was in an easterly direction towards Route 202. Also discharged into the tumble sump were solvents from the barrel storage room.

Degreasing agents were used in bulk, such as in a vapor degreaser; parts in quantity were inserted for degreasing. Degreasing agents were also used by machine operators to remove oils in order to measure the parts.

NHBB began recycling solvent with distillation processes in 1969. The reason why NHBB began to recycle solvent was to save money on solvent purchases. There were at least two solvent distilling units in operation at NHBB in or around 1971.

The tumble area sump operated from 1968 to the present. Waste solvents in free phase and dissolved form travelled into the tumble sump as a result of various spills on to the plant floor and by the pouring of floor washing water into the tumble sump. Waste solvents collected in free phase at the bottom of the tumble sump and leached through cracks and pores in the concrete into the soil and groundwater under the tumble sump and caused or contributed to the cause of dense non-aqueous phase liquids ("DNAPL") in groundwater at the site.

Outfall 001 was in existence from 1957 to the present time, i.e., 1994 and through it polychlorinated biphenyls (PCB) and polycyclic aromatic hydrocarbons (PAH) were discharged to the ground at the site during that time period.

Outfall 002 was in existence from 1966 to the present time, i.e., 1994 and solvents, including TCE, and TCA, as well as PAH's were discharged through it to the ground at the site throughout that time period.

Outfall 003 was used from 1968 to 1974 and solvents, including TCE and TCA, were discharged to the ground at the site throughout that time period.

Outfall 003A was used from 1960 to approximately 1966 and solvents were discharged through it to the ground at the site throughout that time period. The leach field operated from 1957 through 1972, when the facility was connected to the town of Peterborough sewer system.

The plaintiff alleges that 2,000 gallons of pollutants went into the groundwater. Defendants state that there were tens of thousands of gallons of pollutants going into the groundwater. The plume is fifteen hundred to two thousand feet in length. At the time of trial remedial costs were approximately $20,000,000.00.

The court prior to trial took a view of the premises and contiguous areas. The view was all encompassing. The court and counsel observed the manufacturing process that NHBB is involved in. Areas where solvents had been discharged were shown to the court. The premises adjacent to the building were also observed such as the sump area, maintenance shed, area of GZ 4 and other wells, the wetlands, brook and the land down to Route 202. The court also observed where the municipal well was located; the distance between the well and NHBB's building; and the location of the Contoocook River with respect to where the plume is located at the present time.

■ Also pointed out to the court by counsel were the various wells and buildings which will be involved in remedial action. A view can be considered as evidence. *See Chouinard v. Shaw,* 99 N.H. 26, 104 A.2d 522 (1954).

The court finds that during the 1950's, 1960's and early 1970's, as a general proposition the public and industry were not cognizant of the threat which hazardous wastes posed to the environment in general and groundwater in particular.

The defendants presented evidence to the contrary. Dr. James E. Etzel, who is a well qualified expert on industrial waste discharge testified that as far back as 1943, referring to the first Purdue Industrial Waste Conference, some industries were aware of the noxious effects of industrial waste.

Soon after moving to the new plant in 1956, NHBB removed its spent solvents and other industrial wastes to the Peterborough town dump. Tank trailers were used.

One of the trailers used had a capacity of 250 gallons. Subsequent trailers had capacities of 500 to 750 gallons. On most occasions employees were circumspect in the disposal process, but on occasion, about twice a year because of inclement weather, solvents and waste were discharged on the NHBB premises which subsequently went into the groundwater. These discharges on the premises were not accidental. There were other occasions when tanks would overflow and spent solvents of the liquid variety were discharged to the ground at an area located at the southwestern corner of the NHBB building. These discharges could be considered accidental. In time NHBB attempted to rectify the overflow problem by inserting floats. On occasions even with the float mechanism there was also additional overflow. An occasional tanker load was dumped in the northeast corner of the premises. There was evidence of tanker dumping by the garage area or southwest corner and also the present parking lot area. At the time only half of the building had been constructed. Tanker dumping ceased in the early seventies. Dumping of the contents of the tanker was not secretive. There was also a tumble area sump which was located at the southwest corner of the building.

Throughout the period 1957 to at least 1983, chemicals handled in the barrel storage area were spilled, resulting in the release of solvent to the ground at the site in each year between 1957 and 1982. The tumble sump occasionally overflowed, causing solvents in free phase and dissolved forms to be released to the ground at the site.

On or about May, 1982, a roof tank with a capacity of 275 gallons leaked TCA through a ruptured pipe, resulting in the discharge of TCA through roof leaders to Outfall 002 and subsequently onto the ground at the site.

There are outfalls leading from floor drains and through the plant septic system. Wastes were discharged from sinks, floor drains and roof drains onto the ground. Eventually wastes went into the wetland area of the NHBB property. Other wastes went into the brook and then into the Contoocook River situated easterly of the plant. Fortunately, the wastes went under the river. Floor drains went to the town sewer and roof drains went to outfalls that were at the brook. In 1982 more floor drains were sealed up. In late 1982 NHBB was still discharging volatile compounds from its outfalls. When this was discovered mop water and waste oil were put into 55 gallon drums and disposed of. In the early years two stills were used to reclaim solvents. TCA was expensive, so NHBB attempted to reclaim it. Subsequently a more efficient still was installed. NHBB made an effort to ascertain solvents purchased, but records are not extant prior to 1980. Some chemical wastes were discharged into sinks on the premises and wound up in the septic tank.

Hydrogeological investigations were conducted by NHBB with respect to the polluting of the South Well. NHBB also made inquiries to their employees and checked its purchasing records to find out whether it was responsible for the contamination.

Use of the well was discontinued by the Town of Peterborough on December 2, 1982. In May of 1983, the South Well and contiguous areas were put on the National Priorities List ("NPL"). This made it eligible for funding under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA").

Generally, the area of contamination as defined by the EPA included NHBB's property, the South Well part of the Contoocook River which winds in a serpentine fashion throughout this area and contiguous wetlands.

Chronologically, the EPA notified NHBB that it was considered a potential source of the South Well contamination. On May 17, 1986 NHBB decided to enter into a consent decree order with the EPA. NHBB also agreed to conduct a Remedial Investigation and Feasibility Study ("RIFS") in order to clean up the South Well contamination. NHBB decided to do this on its own because it felt it could mitigate the costs of remediation and investigation. If EPA was allowed to do it, NHBB felt the costs would be higher.

### EPA and State of New Hampshire Intervention

The feasibility study was prepared by Emtek under EPA supervision. It was estimated that it would take 19 to 32 years to clean up the most highly contaminated parts of the aquifer. This was to be accomplished by pumping of groundwater, soil vacuum extraction and excavating the wetlands.

The Record of Decision or ROD was issued on September 27, 1989. EPA and NHBB negotiated with respect to the remedial action necessary. EPA then issued a unilateral administrative order on June 19, 1990 ordering NHBB to implement the ROD and the scope of the work. NHBB was ordered to meet both federal and state cleanup requirements.

NHBB notified defendants of its decision and they refused to defend NHBB which led to the institution of this petition for declaratory judgment. On November 4, 1984, NHBB notified AMICO that it might have claims made against it for the contamination of the South Well.

NHBB was acquired by Minebea Company, Ltd., a Japanese company, in March, 1985 shortly after NHBB received a "potentially responsible party" ("PRP") letter on January 31, 1985.

### DNAPL Problem

Perhaps the most harmful insidious contaminant found on the NHBB site is DNAPL. It has been defined as a dense nonaqueous phase liquid which is heavier

than water liquid. Among other locations, DNAPL was found in the GZ–4 area.

DNAPL refers to the oily liquid or immiscible liquid. DNAPL can only be converted into an aqueous phase. This DNAPL consists of pure solvent that is not presently part of the groundwater contamination but which slowly dissolves and acts as a source of future groundwater contamination. Except for its dissolution into the groundwater, the DNAPL does not move.

The presence of DNAPL exacerbates the problem of cleaning up an area within the remedial standards promulgated by the EPA which can prove almost insurmountable.

There is DNAPL present at the NHBB site. This is evidenced by the persistent plume at the site and contiguous areas. DNAPL sites below the water table and gradually dissolves in time.

It takes little DNAPL going below the water table to cause significant groundwater contamination. It may take as long as 200 years of normal flushing to get rid of the DNAPL.

With respect to the DNAPL and contaminants which contributed to it, NHBB conducted employee interviews in order to ascertain how the contamination came about. Mainly, maintenance personnel were interviewed as they were more involved in disposal of contaminants.

Because of the presence of DNAPL at the site, NHBB's consultants and experts agreed that for all practical purposes, the goal of the response action should be to contain the contaminants in the NPA plume.

### The Plume

The groundwater flow direction is from the west, then generally tending to turn north up the valley. Two general plumes mingled as they got further away from the NHBB facility.

The plume is now static. The outer part of the plume shows 100 parts per billion of total VOC's in the groundwater at the northeast corner of the building; the range is between 10,000 and 99,000 parts per billion near well GZA–4. There were two primary contaminants found in the groundwater plume at the South Well, TCA and TCE.

The contamination at the South Well site has been traced to a plume of contaminated groundwater emanating from the NHBB manufacturing facility located on Rt. 202 in Peterborough, New Hampshire which is approximately 1,200 feet from the South Well.

The ROD divides the contaminated groundwater into two plumes—the NHBB plume area ("NPA") and the dilute plume area ("DPA") which will be treated by a system of extraction wells. The dimensions of the plumes are set forth in detail in defendants' ACS exhibits 150 and 151.

Set forth on these exhibits are EPA designated NHBB Plume Area, Hull and Associates NHBB Plume Area and EPA designated Dilute Plume Area.

The northeast edge of the plume after crossing Route 202 is located near EM 109.

## DISCUSSION

### Burden of Proof

NHBB argues that the burden of proof in this case should be on the defendant insurance companies. The defendants dispute this claim and argue that the burden of proof is on NHBB as the moving party. In support of its argument, NHBB asserts that the New Hampshire declaratory judgment statute applies, placing the burden on the defendants. See RSA 491:22–a. RSA 491:22 states in pertinent part:

> Any person claiming a present legal equitable right or title may maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties and the court's judgment or decree thereon shall be conclusive. No petition shall be maintained under this section to determine coverage of any insurance policy unless it is filed within 6 months after the filing of the writ which gives rise to the question ...

NH RSA 491:22.

Assuming RSA 491:22 applies, then RSA 491:22–a also applies, placing the burden of proof in a lawsuit involving insurance cover-

age on the insurance company. RSA 491:22–a states as follows:

> In any petition under RSA 491:22 to determine the coverage of a liability insurance policy, the burden of proof concerning the coverage shall be upon the insurer whether he institutes the petition or whether the claimant asserting the coverage institutes the petition.

NH RSA 491:22–a.

■ This declaratory judgment action was originally filed in New Hampshire Superior Court and removed, based on diversity of citizenship, to Federal District Court. Whether the plaintiffs are suing under state or federal declaratory judgment law, the question of burden of proof will be governed by New Hampshire substantive law. *See American Title Ins. v. East West Finance Corp.*, 959 F.2d 345, 348 (1st Cir.1992).

The question thus becomes, does the New Hampshire declaratory judgment statute apply in this case. If it does not, then the burden in this case is not shifted to the defendants under RSA 491:22–a, but remains with the plaintiff under traditional New Hampshire contract principles placing the burden on the party arguing the contract has been breached. *See Makris v. Nolan*, 115 N.H. 135, 136, 335 A.2d 655 (1975); *The Travelers Ins. Co. v. Greenough*, 88 N.H. 391, 392, 190 A. 129 (1937).

■ The gravamen of this dispute lies in the language of the second sentence of the New Hampshire declaratory judgment statute. The court must determine whether that language illustrates a legislative intent that in an insurance coverage case an underlying action must be filed in New Hampshire state court giving rise to the declaratory action in order to invoke RSA 491:22 or whether that language simply means that when there is an underlying lawsuit, it must be filed in a New Hampshire state court.

NHBB asserts that the language in the statute above does not mandate that an underlying lawsuit exist in an insurance coverage case but rather that when there is one it must be in a New Hampshire state court. Therefore, it argues, it is proper to invoke this statute when the underlying action is a federal or state administrative action such as when the EPA is enforcing a consent decree for an environmental cleanup. Plaintiff relies on a well reasoned decision by New Hampshire Superior Court Judge Robert Lynn on this same issue written in August of 1993 supporting its view. *See Conductron Corp. v. American Employers Insurance Company et al.*, 93–e–149 (N.H. Superior Court 1993).

Defendants argue that the language of that statute, especially the word "writ" requires that a state lawsuit underlie the declaratory judgment action in an insurance coverage case. Since in this case there is no such lawsuit, the defendants argue, the statute doesn't apply and the burden remains with plaintiff. They rely on a 1993 order from Federal Judge Paul Barbadoro in *Town of Allenstown, et al. v. National Casualty Company*, C–90–501–B, (July 93), which found that in a federal declaratory action insurance case, the underlying suit may not be filed in federal court for the New Hampshire statute to apply since that statute requires a state court underlying action.

While plaintiff makes a persuasive argument supported by limited case law, this court feels compelled to follow the plain language of the New Hampshire declaratory judgment statute, and obligated to interpret the plain meaning of Judge Barbadoro's opinion as well as a plethora of other published opinions.

In *Town of Allenstown*, Judge Barbadoro wrote "even though the burden of proof in this diversity case is governed by New Hampshire law, the plaintiffs may not invoke the burden shifting provisions of RSA 491:22–a because, irrespective of where the insurance coverage claim is brought, RSA 491:22 *et seq.* does not apply if the underlying action was brought in the federal court." The corollary of this is that an underlying action must be brought in New Hampshire state court in order to invoke RSA 491:22.

The plain language of the statute itself refers to a "writ" giving rise to the underlying action. RSA 491:22; *see Jackson v. Federal Insurance Co.*, 127 N.H. 230, 232, 498 A.2d 757 (1985) ("[t]he plain language of the

statute clearly applies only to state actions."). Whether this court agrees with the statute or the policy behind it is not at issue when the plain meaning of the language indicates that an underlying lawsuit in state court, in which a "writ" is filed to commence an action, is required.

Although it appears that the New Hampshire Supreme Court has not directly addressed the specific issue the court is confronted with, it appears to go along with this court's position. *See e.g., Scully's Auto–Marine Upholstery, Inc. v. Peerless Insurance Company, Inc.,* 136 N.H. 65, 67, 611 A.2d 635 (1992) ("the use of RSA 491:22 is limited to parties involved in suits brought in New Hampshire state courts only"); *Mottolo v. United States Fidelity & Guaranty Co.,* 127 N.H. 279, 285, 498 A.2d 760 (1985) ("Mottolo is barred from invoking the aid of the State declaratory judgment statute, because that statute relates solely to State actions and not those under federal jurisdiction"); *cf. Town of Peterborough v. Hartford Fire Ins. Co.,* 824 F.Supp. 1102, 1107 (D.N.H.1993) ("where the underlying action was brought in a New Hampshire state court").

The plain language of the New Hampshire declaratory judgment statute makes it clear that in insurance declaratory actions, an underlying lawsuit in state court must give rise to the action in order to invoke the statute and accompanying provision regarding the burden of proof. Since this is not the case here the statute is inapplicable as is the burden of proof statute and thus the burden remains on the plaintiff.

Incidentally, NH RSA 491:22–c does not help the plaintiff here as they argue it should. That statute states:

[t]he remedy of declaratory judgment to determine the coverage of a liability policy under RSA 491:22, 22–a, and 22–b shall also be available in the United States District Court for the District of New Hampshire when that court may properly adjudicate the matter under the laws of the United States.

NH RSA 491:22–c.

As Judge Barbadoro explained in *Town of Allenstown,* that statute only serves to make the declaratory judgment statute applicable in federal court where it would have been applicable if the same action were brought in state court. Here, the declaratory judgment statute would not be available to NHBB in state court so it is likewise not available in federal court.

### Burden of Proof—AMICO Policies Prior to 1972

■ With respect to the burden of proof, the court addresses NHBB's contention that AMICO provided general liability coverage for three years prior to July 1972.

Richard St. Onge, staff administrative assistant for NHBB during the years in question, was in charge of matters concerning insurance. St. Onge testified that AMICO had insurance policies at this time with NHBB. There was lack of evidentiary proof as to the type of coverage, policy limits and the terms and conditions of these policies.

The court finds that NHBB while proving that policies were extant at this time with AMICO, failed to carry its burden of proof relative to the terms and conditions of these policies.

■ In a contract case the burden of proof is on the plaintiff to prove its existence. *See Makris v. Nolan,* 115 N.H. 135, 335 A.2d 655 (1975). *See Town of Peterborough v. The Hartford Fire Insurance Company et al.,* 824 F.Supp. 1102 (D.N.H.1993). Accordingly, the court determines that the New Hampshire Supreme Court would adopt the view that in suits to establish coverage under an insurance contract or policy, the party seeking to affirmatively establish coverage bears the initial burden of proving the existence and validity of the policy or contract at issue. *See* 46 C.J.S. *Insurance* § 1316 (1946 & Supp.1992) (citing *Hartford Acc. & Indem. Co. v. Spain,* 520 S.W.2d 853 (Tex.Civ.App. 1975), *writ ref'd n.r.e.* (July 7, 1975) *and reh'g of writ of error overruled* (July 23, 1975); *Saggau v. State Farm Mut. Ins. Co.,* 16 Ariz.App. 361, 493 P.2d 528 (1972); *Barnes v. Motorists Mut. Ins. Co.,* 29 Ohio App.2d 167, 58 O.O.2d 235, 279 N.E.2d 635 (1971); *Rothstein v. Aetna Ins. Co.,* 216 Pa.Super. 418, 268 A.2d 233 (1970); *B.T.U.*

*Insulators, Inc. v. Maryland Cas. Co.,* 175 So.2d 899 (La.Ct.App.1965); *Epstein v. Great Am. Ins. Co.,* 54 Tenn.App. 447, 392 S.W.2d 331 (1965): *Fuller v. Eastern Fire & Cas. Co.,* 240 S.C. 75, 124 S.E.2d 602 (1962); *Fallins v. Durham Life Ins. Co.,* 247 N.C. 72, 100 S.E.2d 214 (1957); *New Hampshire Fire Ins. Co. v. Walker,* 178 Ark. 319, 11 S.W.2d 772 (1928); *Hawkeye Clay Works v. Globe & Rutgers Fire Ins. Co.,* 202 Iowa 1270, 211 N.W. 860 (1927); *Kitchen v. Yorkshire Ins. Co.,* 226 Ky. 376, 10 S.W.2d 1074 (1928)); *See also Emons Indus. v. Liberty Mut. Fire Ins.,* 545 F.Supp. 185, 188 (S.D.N.Y.1982) (citing *Lapierre, Litchfield & Partners v. Continental Casualty Co.,* 59 Misc.2d 20, 297 N.Y.S.2d 976, 979 (N.Y.Sup.Ct.1969) *modified on other grounds and aff'd,* 32 A.D.2d 353, 302 N.Y.S.2d 370 (1969)) ("New York, like most jurisdictions, places upon plaintiff in an action based on an insurance contract the burden of proof to establish the existence of the policy sued upon and the provisions upon which the suit is based."); *Chix v. Georgia Farm Bureau Ins.,* 150 Ga.App. 453, 258 S.E.2d 208 (1979). In making this determination, the court is particularly mindful that in the absence of such an allocation of the burden of proof, New Hampshire courts could face the inappropriate task of determining an insurer's duties under an alleged yet factually nonexistent insurance policy.

The court finds as follows:

■ NHBB's contamination of the soils and top surface of the soil was not fortuitous. It was an intentional discharge of solvents.

NHBB did not realize the consequences of its acts during the time germane to this case of the untoward effect discharge of solvents would have on groundwater. *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d. 30 (1st Cir.1984) is not apposite. In *Great Lakes* the principal business of the company was to clean solvents from barrels by directly dumping them either on the ground or into lagoons. Furthermore, Great Lakes and its predecessors were aware that water from its drinking wells on its premises were contaminated and had stopped using the wells. Regardless they continued to contaminate their premises and contiguous areas after being cognizant that they were polluters. Additionally, the company also purposely buried drums on site with knowledge that they contained noxious noisome solvents.

The court's decision is anomalous concerning coverage. The court in essence has made findings whereby it found convincing evidence that certain damages sustained to the environment are not covered by the defendants' policy with respect to soil contamination. The court also found that damage to the groundwater was not intentional and there is coverage.

## Occurrence

■ When a federal court sits in diversity, it must apply the substantive law of the state in which it sits. *See Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The New Hampshire Supreme Court has indicated that in interpreting "occurrence" in an insurance policy, courts must focus on the definition of accident "as a cause of injury as distinct from the injury itself." *Mottolo v. Fireman's Fund Ins. Co.,* 830 F.Supp. 658 (D.N.H. 1993).

An "occurrence" is defined in the policies issued by the defendants as "an accident, including continuous exposure to conditions, which results in property damage or bodily injury during the policy period which is neither expected nor intended from the standpoint of the insured."

"[A]n accident is an undesigned contingency ... a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." *Vermont Mutual Insurance Company v. Malcolm,* 128 N.H. 521, 523, 517 A.2d 800 (1986).

■ The general rule for applying "accident" or "occurrence" causation coverage looks to the insured party to determine whether the causal event was fortuitous or not. *See Vermont Mutual Insurance Company, supra* at 523, 517 A.2d 800.

"An insured's intentional act can never be considered accidental 'unless some additional unexpected, independent and unforeseen [cir-

cumstances exist or] happening occurs which produces or brings about the result.' Furthermore, we assume that an insured's intentional act cannot be accidental when it is so inherently injurious that it cannot be performed without causing the resulting injury." *Fisher v. Fitchburg Mutual Insurance Company,* 131 N.H. 769, 773, 560 A.2d 630 (1989).

In *Morton Int'l Inc. v. General Accident Ins. Co.,* 134 N.J. 1, 629 A.2d 831 (1993), the *Morton* court stated that it must determine, after reviewing all the available evidence, whether exceptional circumstances exist that objectively establish the insured's intent to injure.

Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage it or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.

In *Mottolo,* the Court did find that sufficient exceptional circumstances existed necessary to infer intent and therefore held that no occurrence had taken place. *See Mottolo,* 830 F.Supp. at 665. The facts in *Mottolo,* however, are quite different from those in the instant case. In *Mottolo,* the plaintiff was in the business of dealing with hazardous waste. *Id.* at 658. There was a plethora of hazardous chemicals found at the site including "acetone, toluene, trichlorethylene, xylene, butyl acetate, methanol, methylene chloride, methyl methacrylate, methyl ethyl ketone, and methyl isobutyl ketone." *Id.* at 659. Furthermore, there were allegations that the plaintiff buried over 1650 drums containing these wastes on the site. *Id.* at 660.

 The facts in the instant case do not rise nearly to the level of those in *Mottolo* in regard to the state of mind of the contaminating party. This court does not find that exceptional circumstances exist sufficient to infer an intention by NHBB to cause the contamination of the ground water. Accordingly, in regard to the contamination of the ground water, there being no actual subjec-

tive intent nor an inference of intent, an occurrence did take place pursuant to the governing policy.

### Trigger

 The comprehensive liability insurance policy obligates the defendants to reimburse NHBB for any amount that they are obligated to pay as a result of an occurrence. Where the harm takes place over a period of years, difficulties arise in fixing the point in time when the damage actually occurred thus triggering coverage under the appropriate policy. It is the timing of the occurrence that triggers coverage under a policy.

The First Circuit has determined that an injury occurs at the time at which it is reasonably capable of diagnosis. In *Eagle–Picher Industries, Inc. v. Liberty Mut. Ins. Co.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983), the court held that an injury resulting from exposure to asbestos occurred when the disease was clinically evident. The court reversed the District Court finding that coverage was triggered by actual diagnosis or death. Instead, the court held that the plain meaning of the policy required that bodily injury result during the policy period rather than be medically diagnosed during the policy period. The court later approved a plan which rolled back the dates on which the policies were triggered to approximate the dates when the disease was reasonably capable of diagnosis. *See Eagle–Picher Industries, Inc. v. Liberty Mut. Ins. Co.,* 829 F.2d 227 (1st Cir.1987).

In *The Hanover Insurance Co., et al. v. Judy M. Tinkham, et al.,* Civil Action No. C–86–539–L (D.N.H. April 7, 1988), this court held that the manifestation theory expounded in the case of *Eagle–Picher* was controlling. In *Tinkham,* the insured sought indemnification for damages caused by contamination to the water supply at Londonderry Green Complex. The court held that the date on which coverage was triggered was the date on which the contamination became evident.

In *U.S. Fidelity & Guaranty Co., Inc. v. Johnson Shoes,* 123 N.H. 148, 461 A.2d 85 (1983), the New Hampshire Supreme Court

fixed the time of occurrence when an oil leak was first capable of discovery. In that case, oil from an underground tank spilled onto neighboring premises after a period of heavy rain in August 1973. However, the court fixed the time of the occurrence in 1971, when a maintenance man reported leaking in the vicinity of the tank, the time at which the damage was reasonably capable of discovery.

In the instant case, the date on which coverage is triggered is the time when the contamination of the groundwater was reasonably capable of discovery. The evidence indicates that NHBB was unaware of the contamination until an investigation by the State of New Hampshire in October 1982. There is no evidence that the damage was reasonably capable of discovery prior to that time. Accordingly, the date of coverage is fixed as of October 1982.

The only policies in effect in October 1982 were the primary and excess liability policies issued by Aetna. Primary policy # 310087 covers $1,000,000.00 for bodily injury liability and $500,000.00 for property damage liability. The excess liability policy # 174603 offers $20,000,000.00 in excess coverage. Since the AMICO policies were issued prior to the trigger date and were no longer in effect as of October 1982, those policies would not offer coverage.

*Damages*

Under the general liability policy in effect at the time of the occurrence, Aetna is obligated to pay all sums for which NHBB is legally obligated to pay as damages. Likewise, the umbrella policy in effect at the time, obligated Aetna to pay NHBB for all damages for which NHBB became legally obligated. Aetna is obligated to pay up to the limit of the policies which at that time totaled $20,500,000.00.

Aetna contends that various costs do not constitute damages within the meaning contemplated in the policies. The seminal case in New Hampshire in determining which costs qualify as damages is *Coakley v. Maine Bonding & Cas. Co.*, 136 N.H. 402, 618 A.2d 777 (1992). In *Coakley*, the court held that the cost of cleanup in compliance with an EPA order as well as associated investigato-

ry costs were damages within the meaning of an insurance policy and compelled the insurer to reimburse the insured for those costs. The *Coakley* court distinguished between those costs which were remedial and those which were preventive, holding that only remedial costs were damages and thus were compensable by the insurer.

■ Aetna concedes that the extraction wells for the DPA are remedial and thus costs under the *Coakley* analysis. However, Aetna argues that the well extraction system for the NPA is preventive and thus the costs are not recoverable. Aetna argues that the high levels of contamination in the NPA effectively prevent a complete cleanup in the near future. Instead, Aetna argues that the effect of the well extraction system is to contain the DNAPL and prevent further migration into the groundwater. Aetna cites the use of a hydraulic barrier which acts to contain contamination as evidence that this method is purely preventive. The court does not find Aetna's argument persuasive. The purpose of the extraction well system is to remove the contaminants from the groundwater. The distinction between the DPA and the NPA is artificial. Both well extraction systems operate to remove contaminants from the groundwater. The systems are identical in their operation and differ only in their location.

Aetna essentially argues that because the level of contaminants is greater in the NPA than in the DPA, the extraction system will only operate to prevent the spread of the contamination and thus is preventive. This argument is not persuasive. The purpose of the well extraction system in the NPA is to remove existing contaminants. However, since the pollution level is so high, the effect of this system is to keep the contaminants at a static level.

Likewise, the use of the hydraulic barriers to contain the contaminants prior to their removal does not qualify the NPA extraction system as preventive. Containment of the contaminants prior to removal is part and parcel of the cleanup operation. It would be impossible to effect the removal of the con-

taminants if they were permitted to disperse throughout the groundwater.

■ Aetna further contends that the air sparging system is preventive and thus those costs are not recoverable under *Coakley.* The air sparging system operates similarly to the well extraction system. Both methods remove the contaminants by infusing air into the water. The well extraction system pumps the groundwater from each plume from the ground to stripping towers where it is treated by an air stripping system. The air sparging system operates on the same basis however the air treatment is done below ground. Air is infused into the groundwater which acts to separate the contaminants causing them to percolate into the soil. The contaminants are then removed by a vacuum extraction system. Aetna argues that the air sparging system works to prevent further contamination of the groundwater and thus is preventive and not remedial. Aetna contends that the air sparging system prevents the DNAPL from dissolving and migrating into the groundwater.

Aetna's argument appears to focus on testimony that the DNAPL resides in the groundwater zone but is not dissolved in the groundwater itself. *See* Trial Transcript, December 8, 1993, A.M. Session, Pg. 58 (Testimony of Thomas Roy); Trial Transcript, December 7, 1993, A.M. Session, Pg. 73 (Testimony of Wesley Stimpson). However, this system was designed as an integral part of the groundwater cleanup process. DNAPL is only one of several contaminants found in the groundwater. The system was tested after the issuance of the EPA Record of Decision in order to enhance the groundwater cleanup. *See* Plaintiff Exhibit 86, Explanation of Significant Differences and EPA Fact Sheet, p. 5. The air sparging system was implemented to enhance the extraction and air stripping system. In addition, use of the air sparging system will also remove VOC's already in the groundwater system prior to treatment by the air stripping system. *Id.* at 7. The EPA determined that this system constitutes a "principal element" of the groundwater cleanup remedy. Accordingly, the air sparging and vacuum ex-

traction treatment qualifies as a remedial cost, recoverable under the Aetna policies.

Since the court has determined that all costs associated with the groundwater cleanup are remedial and thus recoverable under the Aetna policies, the final determination is the amount of the damages. NHBB places its total costs as of October 27, 1993, for the groundwater cleanup at $4,734,998.15. *See* Plaintiff's Exhibit 75, Table 19. NHBB estimates its future costs associated with the groundwater cleanup to be $9,478,201.79. *See* Plaintiff's Exhibit 75, Table 21. The total costs amount to $14,213,199.94 and do not include attorneys fees. *See* Plaintiff's Exhibit 75, Table 23.

Aetna estimates the cost of the groundwater cleanup to total $11,480,900.00, $1,181,-007.00 for the DPA plume, $7,626,634.00 for the NPA plume and $2,673,259.00 for air sparging and vacuum extraction. *See* Defendant's Exhibit Am. 140. Costs for the future monitoring and maintenance of the site appear to have been incorporated into these figures.

■ The plaintiff bears the burden of proof as to the issue of damages. *See Robert E. Tardiff, Inc. v. Twin Oaks Realty Trust,* 130 N.H. 673, 679, 546 A.2d 1062 (1988). NHBB has submitted a detailed breakdown of figures prepared by Hull & Associates, Inc., to support their position. *See* Plaintiff's Exhibit 75. The court finds that the plaintiff has met its burden of proof as to damages and is entitled to reimbursement from Aetna in the amount of $14,213,199.94.

### *Exclusions*

■ Once the court has determined that coverage under the 1982–1983 Aetna policies were triggered, the next determination is whether coverage is barred as a result of exclusions in the policies. The only applicable exclusions in this case are the pollution exclusion and the owned property exclusion.

Since the AMICO policies are no longer at issue in this case, the court need not reach the question of whether the pollution exclusion applies. The pollution exclusion was deleted by special endorsements from both Aetna primary and excess liability policies,

the only policies which offer coverage in this case. Consequently, the pollution exclusion could not operate to bar coverage.

Aetna argues that the owned property exclusion operates to bar coverage under their policies. Each of the Aetna policies contain an owned property exclusion which provides that coverage does not apply to "property damage to (1) property owned or occupied or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control." *See* Plaintiff's Exhibit 38, Aetna Policy # 310087. Since the court has determined that coverage does not apply to the soil or wetlands, the remaining issue is whether the groundwater is either owned or in the custody or control of NHBB.

Aetna concedes that the groundwater is not owned by NHBB but instead is a public resource owned by the State. *See* Defendants' Joint Request for Findings of Fact and Conclusions of Law On The Issues of Occurrence, Owned Property and Preventive/Remedial, p. 22, Request 71. (Doc. # 101). However, Aetna asserts that the groundwater was within the care, custody and control of NHBB and thus the exclusion applies.

New Hampshire courts have held that whether the owned property exclusion applies depends upon whether the insured exercised possessory and not merely proprietary control over the property. *See Johnson Shoes*, 123 N.H. at 153, 461 A.2d 45 (citing *Mead v. Travelers Ins. Co.*, 111 N.H. 27, 30, 274 A.2d 792 (1971)). Under any analysis, it is difficult to conceive how NHBB could be deemed to have exercised control over the groundwater. During the time period in question, NHBB relied on the Town of Peterborough for its water and did not extract groundwater for its own use. Accordingly, the court finds that NHBB neither owned nor exercised care, custody or control over the groundwater which was contaminated from pollutants at the NHBB site and thus the owned property exclusion would not operate to bar coverage.

### Costs and Attorneys' Fees

██ The plaintiff claims that they are entitled to reimbursement for costs and attorneys' fees pursuant to RSA 491:22–b. RSA 491:22–b provides "[i]n any action to determine coverage of an insurance policy pursuant to RSA 491:22, if the insured prevails in such an action, he shall receive court costs and reasonable attorney fees from the insurer."

██ The availability of attorneys' fees is determined by state law, even in declaratory judgment actions. *Titan Holdings Syndicate, Inc. v. Keene*, 898 F.2d 265, 273 (1st Cir.1990). The law is well settled in New Hampshire that costs and attorneys' fees are not generally available absent statutory authorization. See *Utica Mutual Insurance Co. v. Plante*, 106 N.H. 525, 526, 214 A.2d 742 (1965). The only statutory basis upon which the plaintiff may assert a claim for attorneys' fees and costs is pursuant to RSA 491:22–b. However, RSA 491:22–b is only applicable to actions brought pursuant to RSA 491:22, the New Hampshire Declaratory Judgment Act. Accordingly, since the court has determined that RSA 491:22 is inapplicable in this case for the reasons stated earlier, the plaintiff is not entitled to attorneys' fees or costs. *See supra* at 14–18.

### Conclusion

The court hereby makes the following findings of fact and rulings of law. The court finds that for the purposes of determining occurrence, only the discharge of contaminants into the groundwater was unintentional. The court finds that the contamination of both the soil and wetlands was intentional. Consequently, NHBB is entitled to reimbursement solely for expenses related to cleanup of the groundwater.

The court further finds that the Aetna primary and excess liability policies for 1982–1983 were triggered by the discovery of contamination in the groundwater in October 1982. These policies offer coverage totalling $20,500,000.00. The remainder of the policies at issue in this case, do not offer coverage as those policies were issued prior to the date of trigger.

The court holds that the pollution exclusion does not apply in this case and that the owned property exclusion does not operate to bar coverage. Accordingly, Aetna is ordered to reimburse NHBB in the amount of $14,-213,199.94 and ordered to defend NHBB in any related suits. NHBB is not entitled to reimbursement for attorneys' fees or costs.

Both parties have submitted Requests for Findings of Fact and Rulings of Law. These requests have either been addressed directly in this order or are hereby denied.