EnergyNorth v. AEGIS et al.          CV-95-591-B    9/30/98

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**EnergyNorth Natural Gas, Inc.**

             v.                                    C-95-591-B

**Associated Electric & Gas**
**Insurance Services, Ltd., et al.**


**MEMORANDUM AND ORDER**


EnergyNorth Natural Gas, Inc., is the successor-in-interest to several companies that, at various times from 1852 until 1952, manufactured coal gas at a plant in Concord, New Hampshire.[1] American Home Assurance Co., Century Indemnity Co., Columbia Casualty Co., International Insurance Co., Lexington Insurance Co., and Lloyd's, Underwriters at London, are insurance companies that issued comprehensive general liability (CGL) insurance policies to EnergyNorth between 1953 and 1986. EnergyNorth brought this declaratory judgment action, pursuant to 28 U.S.C.A. § 2201 (West 1994) and N.H. Rev. Stat. Ann. § 491:22 (1997), against its insurers, seeking indemnification for costs that EnergyNorth incurred in investigating and restoring a Concord, New Hampshire, site polluted with coal tar waste from the company's manufacturing operations.

---

[1] I hereinafter refer to EnergyNorth Natural Gas, Inc., and its predecessors collectively as "EnergyNorth."

EnergyNorth moves for partial summary judgment asserting that coverage was triggered under all of defendants' CGL policies by the occurrence of "property damage" while each policy was in effect. Defendants disagree and submit cross-motions for summary judgment. To prevail on its motion, EnergyNorth must demonstrate that (1) defendants' policies embody a "continuous injury-in-fact" trigger-of-coverage theory in which coverage is triggered by the occurrence of property damage while the policy is in effect; and (2) "property damage" occurred while each of defendants' policies was in effect. While I agree that defendants' policies are triggered by "continuous injury-in-fact" during the life of said policies, the record is not sufficiently developed to permit me to reliably determine whether coverage triggering property damage occurred during each policy period. Accordingly, I grant EnergyNorth's motion for summary judgment in part and deny it in part without prejudice to plaintiff's right to renew the motion at a later date. I deny defendants' cross-motions for summary judgment and do so without prejudice to the extent that they raise issues left unresolved by this order.

## I.  BACKGROUND

### A.  Site History

From 1852 until 1952, EnergyNorth manufactured coal gas for lighting, heating, and cooking at a facility in Concord, New Hampshire. The manufacturing process produced a number of by-products, including an emulsion of coal tar and water that was

routinely discharged through a pipe into a marshy area adjacent to the Merrimack River now known as the "Tar Pond." Most of the coal tar settled into the sediment and subsoils at the bottom of the pond. Some of it, however, remained in a free liquid phase in depressions at the bottom of the Tar Pond.

In 1992, suspecting that the Tar Pond was contaminated with by-products of the plaintiff's manufactured gas operations, the New Hampshire Department of Environmental Services ("NHDES") directed EnergyNorth to conduct a site investigation of the Tar Pond to determine the location and extent of contamination. The investigation revealed coal tar and other contaminants including polycyclic aromatic hydrocarbons (PAH), and benzene, toulene, ethylbenzene, and xylenes (collectively "BTEX compounds") in the surrounding surface water, groundwater, and soil. The parties agree that the PAH and BTEX compounds are constituents of the coal tar found at the site.

**B.** **Insurance Policies**

Although there are numerous policies at issue in this case with coverage periods spanning several decades, the parties concede that the policies all fall within one of three different categories for analytical purposes. Transcript of May 15, 1998, Hearing at 42, 64-65, 96-97, EnergyNorth Natural Gas, Inc. v. Associated Elec. & Gas Ins. Servs., Ltd. (D.N.H.) (No. C-95-591-B).

1. Occurrence-Based Policies

Between 1966 and 1986, Century, Columbia, International,

3

Lexington, and Lloyd's sold EnergyNorth "occurrence"-based policies.  Three versions of this type of policy are at issue here.  Between 1966 and 1973, all policies issued by Lexington, and some policies issued by Century, incorporated the following language by reference:[2]

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . . caused by an occurrence . . . .
>
> "occurrence" means an accident, including injurious exposure to conditions, which results, during the policy period, in . . . property damage neither expected nor intended from the standpoint of the insured . . . .
>
> "property damage" means injury to or destruction of tangible property. . . .

Between 1973 and 1986, all policies issued by Lexington, and some policies issued by International, either incorporated by reference or directly set forth the following language:[3]

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage . . .

---

[2]  The Lexington and Century policies, as excess insurance policies, referred to language set forth in policies issued by Fidelity and Casualty Co., one of EnergyNorth's primary insurance carriers.  Fidelity and Casualty is not a party to this suit.  Endorsements to the Lexington policy amending the definition of "property damage" do not affect the definition in a way material to this action.

[3]  One Lexington policy issued during this time period provided primary insurance coverage and set forth this language directly.  A second Lexington policy, as an excess insurance policy, referred to the language contained in the primary Lexington insurance policy.  The other Lexington policies, as well as the International policies, as excess insurance policies, referred to language set forth in policies issued by Fidelity and Casualty.  Endorsements to certain Lexington policies amending the definition of "property damage" do not affect the definition in a way material to this action.

caused by an occurrence . . . .

&#x201C;occurrence&#x201D; means an accident, including continuous or
repeated exposure to conditions, which results in . . .
property damage neither expected nor intended from the
standpoint of the insured . . . .

&#x201C;property damage&#x201D; means . . . physical injury to or
destruction of tangible property which occurs during the
policy period, including the loss of use thereof at any time
resulting therefrom . . . .

Between 1971 and 1986, all policies issued by Lloyd&#x2019;s and
Columbia, and some policies issued by Century and International,
either incorporated by reference or directly set forth the
following language:[4]

This insurance is to pay on behalf of the Assured all sums
which the Assured shall become legally obligated to pay, or
by final adjudment be adjudged to pay, to any person . . .
as damages because of . . . injury to or destruction of
tangible property of others, including the loss of use
thereof (hereinafter referred to as &#x201C;Property Damage&#x201D;) . . .
occurring during the period of insurance mentioned in the
Schedule, caused by an occurrence . . . .

The word &#x201C;occurrence&#x201D; means an accident, including injurious
exposure to conditions, which results, during the period of
insurance mentioned in the Schedule, in . . . Property
Damage neither expected nor intended from the standpoint of
the Assured . . . .

&#x201C;Property damage&#x201D; is not defined further by these occurrence-
based policies.

2.    Accident-Based Policies

Between 1953 and 1971, Lloyd&#x2019;s sold EnergyNorth &#x201C;accident&#x201D;-
based policies.  Two varieties of this type of policy are at

_____

    [4]  The Lloyd&#x2019;s policies issued during this time period
provided primary insurance coverage and set forth this language
directly.  The Columbia, Century, and International policies, as
excess insurance policies, referred to language set forth in the
Lloyd&#x2019;s policies.

issue here.  The policies issued by Lloyd's between 1953 and 1962 state:

> This insurance . . . is to indemnify the Assured . . . for any and all sums which the Assured shall by law become liable to pay . . . as damages . . . (b) for damage to or destruction of property of others . . . caused by accident . . . hereinafter referred to as "Property Damage" . . . .
>
> The word "accident" shall be understood to mean an accident or series of accidents arising out of one event or occurrence. . . .

The policies issued by Lloyd's between 1962 and 1971 state:

> [T]he underwriters hereby agree . . . to pay on behalf of the Assured . . . all sums which the Assured shall become obligated to pay, or by final judgment be adjudged to pay . . . as damages . . . (b) for damage to or destruction of property of others . . . (hereinafter referred to as "Property Damage") caused by accident occurring during the period mentioned in the Schedule . . . .
>
> The word "accident" shall be understood to mean an accident or series of accidents arising out of one event or occurrence. . . .

"Property damage" is not defined further by either variety of the Lloyd's accident-based policies.

### 3.   Non-Standard Occurrence-Based Policies

Between 1980 and 1986, American Home sold EnergyNorth "non-standard" occurrence-based policies.  The American Home policies state:

> The Company hereby agrees to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed on the Insured by law, [or which] are assumed by the Insured under contract or agreement, for damages direct or consequential, and expenses . . . on account of: . . . ii) Property Damage . . . . caused by or growing out of each occurrence. . . .

6

The term "Property Damage" . . . shall include . . . damage to or destruction or loss of property . . . .

The term "Occurrence" . . . shall mean one happening or series of happenings, arising out of or due to one event taking place during the term of this contract. . . .

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  Id. at 248.  In ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-movant and determine whether the moving party is entitled to judgment as a matter of law.  Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

Where the nonmoving party bears the burden of persuasion at trial, it must "make a showing sufficient to establish the existence of [the] element[s] essential to [its] case" in order to avoid summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  It is not sufficient for the non-movant to

7

"rest upon mere allegation[s] or denials [contained in that party's] pleading." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, 477 U.S. at 256). Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the nonmoving party." Id. at 842 (internal citations omitted).

Where the moving party bears the burden of persuasion at trial, the movant must support its position with materials of evidentiary quality. See Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 n.1 (1st Cir. 1994). Further, "[the] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Lopez v. Corporacion Azucarera de Puerto Rico, 938 F.2d 1510, 1516 (1st Cir. 1991).

I have previously determined that EnergyNorth's declaratory judgment claims are to be judged using the burden of proof specified in N.H. Rev. Stat. Ann. § 491:22-a. EnergyNorth Natural Gas, Inc. v. Associated Electric & Gas Insurance Services, Ltd., et al., CV-95-591-B (D.N.H. September 30, 1998). Section 491:22-a provides that when a suit is brought under section 491:22 to determine insurance coverage, "the burden of proof concerning coverage shall be upon the insurer whether he institutes the petition or whether the claimant asserting the coverage institutes the petition." N.H. Rev. Stat. Ann. § 491:22-a. Accordingly, when addressing questions of fact concerning policy coverage, defendants must prove that their

8

policies do not afford EnergyNorth the coverage it seeks.  I apply these standards to the parties' summary judgment motions.


## III.  DISCUSSION

Defendants' insurance policies must be interpreted in accordance with New Hampshire law.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938) (court must apply state law to resolve substantive legal issues in diversity of citizenship cases).  Accordingly, I first outline New Hampshire's relevant rules of policy construction and then apply those rules to the specific questions presented by the motions for summary judgment.

### A.    Policy Construction Rules

Determining the meaning of a provision contained in an insurance policy presents a question of law that must be resolved by the court.  High Country Assocs. v. New Hampshire Ins. Co., 139 N.H. 39, 41 (1994).  When answering this question, the court must first determine whether judicial precedent "clearly defines [the] term at issue."  Coakley v. Maine Bonding & Cas. Co., 136 N.H. 402, 409-10 (1992).  If such precedent exists, the court "need look no further than that definition."  Id.

If a prior Supreme Court decision has not previously defined a disputed policy term and the policy itself does not define the term, the court "must construe the policy in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured."  Coakley, 136 N.H. at 410 (internal quotations omitted).  If the policy term is unambiguous

9

when construed from this perspective, the court must give the term its plain meaning.  Id. If, however, an ordinarily intelligent insured could reasonably interpret the policy in more than one way and one of the plausible interpretations favors coverage, the policy must be construed "in favor of the insured and against the insurer."  High Country Assocs., 139 N.H. at 41.

In determining whether a term reasonably can be interpreted in more than one way, New Hampshire courts look to (1) the plain language of the policy provision in dispute, see High Country Assocs., 139 N.H. at 41; (2) whether differences of opinion exist among other jurisdictions concerning the meaning of the term, see Hoepp v. State Farm Ins. Co., 142 N.H. 189, 191 (1997); and (3) whether dictionaries provide alternative definitions of the term, see Hudson v. Farm Family Mutual Ins. Co., 142 N.H. 144, 146-47 (1997); Coakley, 136 N.H. at 417.

B.    **Trigger of Coverage**

1.    Background

The term "trigger" never appears in the language of CGL policies.  Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d 974, 979 (N.J. 1994), cited in James M. Fischer, Insurance Coverage for Mass Tort Exposure Claims: The Debate over the Appropriate Trigger Rule, 45 Drake L. Rev. 631-32 (1997).  Rather, the term describes the type of event that must occur before the insurer must respond to a claim.  See Owens-Illinois, 650 A.2d at 979; Fischer, supra, at 631-32.  Determining the type of event that will trigger coverage under the particular language of a policy

10

is the first step in assessing whether the policy provides coverage for the claim made against it.  See Fischer, supra, at 631 ("[T]he trigger concept . . . acts as a gatekeeper, matching particular claims with . . . particular insurance policies.").

The occurrence of any one of three events will trigger coverage depending upon the language used in the policy and the relevant state law.[5]  Id. at 640.  Each type of event corresponds to a "trigger-of-coverage" theory of the same name.  The "exposure" theory holds that coverage is triggered under the policy in effect when property is first "exposed" to an injury-producing agent, regardless of whether injury occurs at the moment of exposure.[6]  See Continental Ins. Co. v. Northeastern Pharm. & Chem. Co., 811 F.2d 1180, 1189 (8th Cir. 1987); Montrose Chem. Corp. v. Admiral Ins. Co., 913 P.2d 878, 893 (Cal. 1995); Fischer, supra, at 643.  But see Cessna Aircraft Co. v. Hartford Accident & Indem. Co., 900 F. Supp. 1489, 1501 (D. Kan. 1995) (noting that in the context of an environmental-contamination insurance-coverage dispute, exposure of groundwater to contaminants and injury from exposure could occur virtually simultaneously).

The "injury-in-fact" theory provides that coverage is triggered under the policy in effect when property is "injured"

---

[5]  I exclude "claims made" policies from this discussion as that type of policy is not at issue here.

[6]  The policies at issue also cover claims for personal injury.  I need not consider such claims, however, as EnergyNorth seeks coverage only for amounts it has incurred in responding to property damage.

11

by a harmful event. <u>Staefa Control-System, Inc. v. St. Paul Fire & Marine Co.</u>, 847 F. Supp. 1460, 1473, <u>amended by</u> 875 F. Supp. 656 (N.D. Cal. 1994); <u>Montrose</u>, 913 P.2d at 894; Fischer, <u>supra</u>, at 641. If a policy requires the use of an injury-in-fact trigger-of-coverage theory, mere exposure to a harmful agent without injury will not trigger coverage. <u>Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co.</u>, 682 F.2d 12, 19 (1st Cir. 1982). Further, coverage will not be defeated simply because the injury was not immediately observable. <u>American Home Prods. Corp. v. Liberty Mut. Ins. Co.</u>, 748 F.2d 760, 765 (2d Cir. 1984).

Under the "manifestation" theory, coverage is triggered when the injury first becomes "reasonably apparent or known to the claimant." Fischer, <u>supra</u>, at 644; <u>accord</u> <u>New Hampshire Ball Bearings v. Aetna Cas.</u>, 848 F. Supp. 1082, 1092 (D.N.H. 1994) ("Ball Bearings"), <u>rev'd on other grounds</u>, 43 F.3d 749 (1st Cir. 1995); <u>Montrose</u>, 913 P.2d at 893. Neither the exposure of property to a harmful agent nor injury to property resulting from exposure will trigger coverage before it is reasonably possible to detect the harm caused under a manifestation trigger-of-coverage theory. <u>See</u> <u>Ball Bearings</u>, 848 F. Supp. at 1092-93.

A fourth trigger-of-coverage theory, the "continuous trigger" theory, does not attempt to match a single coverage-triggering event to the policy period in which that event first took place. Instead, coverage is triggered during all policy periods in which any coverage-triggering event occurs. Fischer, <u>supra</u>, at 646; <u>accord</u> <u>New Castle County v. Continental Gas Co.</u>,

12

725 F. Supp. 800, 812-13 (D. Del. 1989); Montrose, 913 P.2d at 894. Under a continuous injury-in-fact theory, for example, coverage would be triggered under all policies in effect when an injury-in-fact occurs. See Fischer, supra, at 647. A variant, the "multiple-trigger" theory, provides that coverage is triggered during all policy periods in which any type of coverage-triggering event takes place, including exposure of property to a harmful agent, injury resulting from exposure, and manifestation of the injury. Id. at 646-47.

2. Analysis

EnergyNorth proposes that each type of CGL policy at issue here requires the use of a continuous injury-in-fact trigger-of-coverage theory. Specifically, plaintiff contends that: (1) under each type of policy, coverage is triggered when damage occurs during a policy period; and (2) where damage occurs in multiple policy periods, coverage is triggered under each policy in effect when the damage occurs. I examine this argument by reviewing each of the three policy types in turn.

(a) Occurrence-based policies

Defendants have taken inconsistent positions as to the trigger-of-coverage theory their occurrence-based policies embody. At various times, the defendants appear to concede that their policies require the use of an injury-in-fact trigger. At other times, certain defendants argue that, while the language of their policies could reasonably be interpreted to adopt an injury-in-fact trigger, New Hampshire law requires the use of a

13

manifestation trigger.  Other defendants argue that only a manifestation trigger is consistent with the language of their policies.[7]  I reject the contention that New Hampshire law requires that occurrence-based policies must be interpreted to embody a manifestation trigger-of-coverage theory.

Defendants rely on United States Fidelity & Guar. Co. v. Johnson Shoes, Inc., 123 N.H. 148 (1983), to show that New Hampshire has adopted a manifestation trigger for occurrence-based policies.  That case, however, provides no support for defendants' argument.  In Johnson Shoes, the insured sought a defense and indemnification from liability claims asserted against it by its landlord.  The landlord sued to recover costs incurred correcting damage caused by a leaking underground oil storage tank formerly used by Johnson Shoes.  Id.  United States Fidelity & Guaranty Corp. ("USF&G") insured Johnson Shoes from the time it first occupied the premises until it terminated its operations in 1972.  Id.  Although the evidence demonstrated that the oil tank had been leaking since at least 1971, when USF&G was still insuring Johnson Shoes, USF&G argued that it was not obligated to defend or indemnify Johnson Shoes because the bulk

---

[7]  Two defendants, Century and Columbia, take the position that manifestation is the only trigger-of-coverage theory that is consistent with the relevant language of their occurrence-based policies.  Other defendants, International, Lexington, and Lloyd's, acknowledge that their policies can reasonably be read to also embody an injury-in-fact trigger-of-coverage theory.  Because the American Home occurrence-based polices contain materially different language from the standard occurrence-based policies discussed in this section, American Home did not express an opinion as to which trigger-of-coverage theory the standard occurrence-based policies embody.

14

of the property damage occurred in 1973, after the last USF&G policy had expired.  Id. at 151.

In rejecting this argument, the court focused on the fact that Johnson Shoes proved that the tank was leaking while a USF&G policy was in effect.  The court did not specify which trigger-of-coverage theory the USF&G policy embodied and the court never used the term "manifestation" in its opinion.  See id. at 153.  Accordingly, Johnson Shoes does not support defendants' claim that New Hampshire has adopted a manifestation trigger-of-coverage theory for occurrence policies.  At most, the decision stands for the proposition that coverage can be triggered under an occurrence-based policy by the occurrence of property damage while the policy is in effect.

Because the New Hampshire Supreme Court has not yet specified which trigger-of-coverage theory or theories an occurrence-based policy embodies, and because the policies at issue here do not expressly adopt any particular trigger-of-coverage theory, I must construe the relevant policy language "in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured."  Coakley, 136 N.H. at 410.  If a reasonably intelligent insured could interpret the policy language in more than one way and one interpretation favors coverage, "an ambiguity exists" that must be construed "in favor of the insured and against the insurer."  High Country Assocs., 139 N.H. at 41.

15

The policy provision at issue here states that coverage is provided in the event of "property damage . . . caused by an occurrence . . . during the policy period." EnergyNorth proposes that under this language: (1) coverage is triggered where property-damage-causing injury occurs during a period in which a policy is in effect; and (2) where damage occurs in multiple policy periods, coverage is triggered under each policy in effect when damage occurs. The relevant policy language clearly supports EnergyNorth's first assertion, as it expressly provides that coverage is triggered by the occurrence of property damage during the policy period. See High Country Assocs., 139 N.H. at 41. Because an insured could reasonably interpret the contested policy language in the way that EnergyNorth proposes, I must construe the language in EnergyNorth's favor and need not determine whether the contested language could also reasonably be construed to embody a different trigger-of-coverage theory. See High Country Assocs., 139 N.H. at 41.

The relevant policy language also supports EnergyNorth's contention that injury which continues to occur over multiple policy periods can trigger multiple policies. See High Country Assocs., 139 N.H. at 41. Nothing in the relevant policy language suggests that injury that occurs in subsequent policy periods cannot trigger coverage in those policy periods, even if the injuries arose from a single causative event.[8] Thus, I hold that

---

[8] Although most defendants accept this conclusion, Century and Columbia took a different position during the oral argument held on August 27, 1998. Because they cite no case law to

16

the language of the occurrence-based policies embodies the theory proposed by EnergyNorth — that where damage occurs in multiple policy periods, coverage is triggered under every policy active when the damage occurs, as long as new damage occurs during each relevant policy period.

#### (b)  Accident-based policies

EnergyNorth argues that the accident-based policies issued by Lloyd's embody the same trigger-of-coverage theory as do the occurrence-based policies discussed above.  Lloyd's disagrees, asserting that for coverage to be triggered: (1) both the event that causes damage to property and the damage itself must occur during a policy period in which a policy is in effect; and (2) the causative event has to be discrete in nature rather than continuous.  I consider each assertion in turn.

#### (i)  Timing of causative event

The policy provision at issue here provides coverage in the event of "damage to or destruction of property . . . caused by accident occurring during the [policy] period."[9]  Lloyd's argues that for coverage to be triggered under this policy language, both the event that produces the damage and the damage itself

---

support their argument and cannot point to language within their policies that would contradict EnergyNorth's claim, their assertion merits no discussion.  See F.D.I.C. v. Slinger, 913 F.2d 7, 14 (1st Cir. 1990) (argument regarding meaning of contract term rejected where unsupported by language of contract).

[9]  Lloyd's and EnergyNorth agree that the definition of property damage contained in the 1953-62 policies and the 1962-71 policies do not materially differ.  Transcript of May 15, 1998, Hearing at 42.

17

must occur during the policy period.  Alternatively, it contends that coverage is triggered when the insured commits the act that produces the damage, rather than when the damage occurs.  EnergyNorth challenges both arguments and instead contends that coverage is simply triggered under these policies when the damage occurs.

The New Hampshire Supreme Court has not construed the precise policy language at issue here.  However, the court's decision in Peerless Ins. Co. v. Clough, 105 N.H. 76 (1963), supports EnergyNorth's position.  In that case, the insured negligently constructed fireplaces in two homes that were later damaged by fires caused by the insured's negligence.  The insured sought coverage under an insurance policy that was in effect when the fires occurred, but not when the insured committed his negligent acts.  The policy in question provided that "this policy applies only to occurrences during the policy period."  In concluding that the policy was triggered by the occurrence of the fires rather than by the insured's negligent acts, the court stated "the majority — and we believe the better rule — is that the time of the occurrence resulting in the loss or damage, and not the time of the negligence, determines whether there is coverage under the policy."  Id. at 78.

None of the Lloyd's policies defines the term "accident" or otherwise specifies when an accident is deemed to occur.  Under these circumstances, it is certainly plausible to follow the general rule and construe the policies to provide that an

18

accident occurs when the injury occurs rather than when the insured commits the act that later produces the injury. Since this interpretation favors the insured in this case, I reject Lloyd's argument to the contrary. Further, nothing in the language of the policies suggests that injury that continues into subsequent policy periods cannot also trigger coverage in those policy periods even if the continuing injury arose from a single causative event. Therefore, I hold that the language of the Lloyd's accident-based policies embodies the theory proposed by EnergyNorth — that where damage occurs in multiple policy periods, coverage is triggered under each active policy when the damage occurs, as long as damage occurs.

### (ii) Nature of causative event

The parties also disagree as to whether Lloyd's accident-based policies provide that coverage can be triggered by continuous, gradual injury to property. The dispute centers on the meaning of the term "accident." Lloyd's asserts that the term "accident" unambiguously means a sudden, discrete event occurring within a policy period. Thus, where property damage does not occur suddenly or discretely, but rather gradually over a number of years, Lloyd's contends that the damage is not caused by accident and cannot trigger policy coverage. EnergyNorth responds by contending that the term "accident" simply means an unintentional act. By this interpretation, injury to property can trigger coverage under the policies at issue whether or not the injury occurs suddenly and discretely or as the result of a

19

gradual process. Thus, to determine whether the language of the Lloyd's accident-based policies provides that coverage can be triggered by continuous, gradual injury to property, I must determine the meaning of the term "accident" as used in the policies.

Although the New Hampshire Supreme Court has not defined the term "accident" in the context of an accident-based policy, the court has construed the term in a closely related context. In Hudson, the plaintiff sought coverage for injury caused over time by the continuous exposure of his livestock to "stray voltage," an electrical current present in metal farm structures such as watering troughs. See 142 N.H. at 144. The policy language at issue provided coverage for harm "caused by . . . sudden and accidental damage from artificially generated electrical current." Id. The plaintiff argued that the phrase "sudden and accidental" merely meant "unexpected and unintended" and, therefore, gradual exposure to stray voltage could constitute harm caused by sudden and accidental damage. Id. at 146, 148. In opposition, the defendant contended that the phrase meant "quick or abrupt" and, consequently, damage had to occur as the result of a quick or abrupt event to trigger coverage. Id.

After canvassing the body of law examining the meaning of the phrase "sudden and accidental," the court found it to be ambiguous in that an ordinarily intelligent insured could reasonably interpret the policy language in more than one way. Id. at 148. Holding that "the term 'sudden and accidental' is .

20

. . reasonably susceptible to an interpretation consistent with 'unexpected and unintended,'" the court found that injury caused by gradual and continual exposure to harm would trigger coverage under the policy. Id. at 148-49. In reaching this conclusion, the court endorsed a decision by the Third Circuit Court of Appeals stating that "simply put, sudden means unexpected and accidental means unintended." Id. (quoting New Castle County v. Hartford Ace and Indem. Co., 933 F.3d. 1162, 1194 (3d Cir. 1991)).

In the instant case, the pertinent policy language is functionally equivalent and nearly identical to the policy language interpreted by the Hudson court. The phrase "sudden and accidental" in the Hudson policy plays the same functional role as does the term "accident" in the Lloyd's accident-based policies in that it modifies the type of injury that must occur to trigger coverage. The one significant difference between the policies -- the use of the word "sudden" in the Hudson policy -- only strengthens the argument that the New Hampshire Supreme Court would interpret "accident" in an accident-based policy similarly to the way in which it interpreted "sudden and accidental" in the Hudson policy. Because the court found the term "sudden and accidental" could reasonably be interpreted to mean "unexpected and unintended," and because "sudden" has a such a strong connotation of abruptness, see Aeroquip Corp. v. Aetna Cas. & Sur. Co., 26 F.3d 893, 894 (9th Cir. 1994); Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 555 N.E.2d 568, 572

21

(Mass. 1990), it is difficult to believe that the court would interpret "accident" when used by itself to mean only an abrupt event.

The New Hampshire Supreme Court has found that a functionally equivalent, nearly identical term is reasonably susceptible to the definition EnergyNorth urges I adopt. Thus, in interpreting the meaning of the contested term, I "need look no further than [the] definition" the <u>Hudson</u> court accepted as reasonable. <u>Coakley</u>, 136 N.H. at 409-10. Accordingly, I hold that the term "accident" as used in the Lloyd's accident-based policies simply means an unintentional act[10] and, therefore, that under the language of these policies, continuous, gradual injury to property can trigger coverage.[11]

_____

[10] A number of other jurisdictions have reached a similar conclusion when construing the meaning of the term "accident" as used in an accident-based policy. <u>See, e.g.</u>, <u>Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.</u>, 817 F. Supp. 1136, 1147-48 (D.N.J. 1993) (holding that the term "accident" does not necessarily have a temporal component); <u>St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.</u>, 923 P.2d 1200, 1212-13 (Or. 1996) (same); <u>City of Kimball v. St. Paul Fire & Marine Ins. Co.</u>, 206 N.W.2d 632, 635-36 (Neb. 1973) (same); <u>cf. Hecla Mining Co. v. New Hampshire Ins. Co.</u>, 811 P.2d 1083, (Colo. 1991) (holding that in the context of a sudden-and-accidental pollution exclusion, the term "sudden and accidental" does not necessarily have a temporal component).

[11] Lloyd's contends that I should allocate the losses stemming from the case among the triggered policies according to the time each policy was on the risk. Lloyd's asserts that this approach was expressly adopted by a New Hampshire court in <u>Conductron Corp. v. American Employers Ins. Co.</u>, Nos. 93-E-149, 93-C-599, slip op. at 16 (N.H. Super. Ct. Mar. 4, 1997) (Arnold, J.), and, therefore, is the approach the New Hampshire Supreme Court likely would adopt. Because the issue of allocation of losses has not been briefed by all the parties involved, I decline to review the issue at this time.

Lloyd's citation to <u>Vermont Mut. Ins. Co. v. Malcolm</u>, 128 N.H. 521 (1986), for the proposition that the New Hampshire Supreme Court has defined "accident" as a discrete event is of no avail. In that case, the court examined the meaning of the term "accident" in the context of an occurrence-based policy. <u>Id.</u> at 522-23. The court stated in dictum that, because the term "occurrence" was explicitly defined to include injurious exposure to continuing conditions and the term "accident" was not, the term "accident" must be taken to mean a discrete event. <u>Id.</u> Given the Supreme Court's more recent contrary holding in <u>Hudson</u>, however, <u>Malcolm</u> must be read to stand for the limited proposition that the term "accident" means a discrete event only when used in conjunction with a term given an explicitly broader meaning. Reading the decision in this manner, it provides no support for defendants' interpretation.

(c) <u>American Home policies</u>

The American Home policies each state that coverage exists for property damage "caused by or growing out of each occurrence . . . [which term] shall mean one happening or series of happenings, arising out of or due to one event taking place during the term of this contract." The parties dispute whether this language provides that coverage can be triggered by continuous, gradual injury to property during the policy period. The dispute centers on the meaning of the term "event." American Home asserts that the term "event" unambiguously means a sudden,

23

discrete event occurring during the policy period.[12]  Conversely, EnergyNorth argues that the term "event" in the American Home policies does not refer to a sudden, discrete event.  Instead, plaintiff asserts that the term simply means an unintentional act and, therefore, injury to property can trigger coverage under the policies at issue whether or not the injury occurs suddenly and discretely or as the result of a gradual process.  Thus, to determine whether the language of the American Home policies provides that coverage can be triggered by continuous, gradual injury to property, I must determine the meaning of the term "event" as used in the policies.

The New Hampshire Supreme Court has not yet construed the meaning of term "event" as used in the context of a policy providing coverage for property damage "caused by . . . [a] series of happenings, arising out of or due to one event taking place during the term of th[e] contract."  Because the court has not defined the term "event" in this context, and because the American Home contract itself contains no informative explanation of the term, I must construe the term "in the light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured."  Coakley, 136 N.H. at 410.  If I

---

[12]  American Home implies that the juxtaposition of the term "event" with the phrase "taking place during the term of this contract" lends a temporal component to the definition of what type of injury triggers coverage under the American Home policies.  This argument has no merit.  If, as EnergyNorth asserts, "event" merely means an unintentional act causing harm, then gradual exposure to pollutants could constitute a coverage-triggering event occurring during the policy period just as much as discrete event causing harm could.

find that an ordinarily intelligent insured could reasonably interpret the term "event" as used in the American Home policies in a way that favors coverage, I must construe the meaning of the term "in favor of the insured." See High Country Assocs., 139 N.H. at 41.

To determine whether the term "event" is reasonably susceptible to more than one interpretation, I look to whether differences of opinion exist among other jurisdictions over the meaning of the term, see Hoepp, 142 N.H. at 191; Hudson, 142 N.H. at 147-48, and whether dictionaries contain differing definitions, see Hudson, 142 N.H. at 146-47, Coakley, 136 N.H. at 417. Other jurisdictions have construed the meaning of the term "event" differently, as it is used in the context of policies similar to those issued by American Home. Some courts have held that the term "event" unambiguously means a sudden, discrete event that precludes continuous, gradual injury to property from triggering coverage. See, e.g., Indiana Gas Co. v. Aetna Cas. & Sur. Co., 951 F. Supp. 780, 789 (N.D. Ind. 1996) (finding that in the context of an environmental-contamination insurance-coverage dispute, "event" refers only to a discrete act such as a spill or leak), judgment vacated on other grounds sub nom. Indiana Gas Co. v. Home Ins. Co, 141 F.3d 314 (7th Cir. 1998); Public Serv. Elec. & Gas Co. v. Certain Underwriters at Lloyd's of London, No. 88-4811(JCL), 1994 U.S. Dist. LEXIS 21072, at *13-16 (D.N.J. Sept. 30, 1994) (same).

25

Other courts, however, have acknowledged that the term "event" is reasonably susceptible to more than one interpretation, including simply an unintentional act, the interpretation proposed by EnergyNorth.  See, e.g., Cessna Aircraft, 900 F. Supp. at 1504 (finding that in the context of an environmental-contamination insurance-coverage dispute, the term "event" can refer to a non-discrete act such as exposure of groundwater to contaminants); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 670 N.E.2d 740, 747-48 (Ill. App. Ct. 1996) (same); Pittsburgh Corning Corp. v. Travelers Indem. Co., No. 84-3985, 1988 WL 5301, at *1-3 (E.D. Pa. Jan. 21, 1988) (finding that in the context of an asbestos-exposure insurance-coverage dispute, the term "event" can refer to a non-discrete act such as exposure of humans to asbestos).

Further, dictionaries define the term "event" in a variety of ways, supporting each party's interpretation of the term.  The Random House Unabridged Dictionary recognizes both a non-temporal and temporal meaning of the term, defining "event," in pertinent part, both as "something that happens" and as "something that occurs in a certain place during a particular interval of time." Random House Unabridged Dictionary 671 (2d ed. 1993).  Black's Law Dictionary also recognizes both a non-temporal and temporal meaning, defining "event" both as "[s]omething that happens . . . which takes place independent of the will" and "that in which an action, operation, or series of operations, terminates." Black's Law Dictionary 554-55 (6th ed. 1990).

26

After consulting these sources regarding the meaning of the term "event" as used in the context of the American Home policies, I conclude that the term is reasonably susceptible to more than one interpretation. Further, I hold that an ordinarily intelligent insured could reasonably interpret the term "event" to simply mean an unintentional act.

Because I conclude that the term "event" is reasonably susceptible to more than one interpretation and that an ordinarily intelligent insured could reasonably interpret the term in the manner EnergyNorth advocates, ordinarily I would have to adopt EnergyNorth's proposed definition. See High Country Assocs., 139 N.H. at 41. American Home, however, has raised an issue that prevents me from doing so. American Home asserts that it did not draft the policy language at issue but, rather, that EnergyNorth or one of its agents drafted the disputed language. If American Home is correct, the rationale behind construing an insurance contract in favor of the insured -- namely, preventing the drafter of a contract from benefitting from an ambiguity of its own creation -- would not apply. See Coakley, 136 N.H. at 410.

American Home has requested additional limited discovery in an effort to gather evidence in support of its position. As I indicated I would at the September 26, 1997, hearing held before me, I now grant American Home 60 days to complete such discovery. Until such time, I deny without prejudice both EnergyNorth's and American Home's motions for summary judgment with respect to

27

which trigger-of-coverage theory the American Home policies embody, and invite the parties to renew this aspect of their motions when the limited discovery period is complete.

## C.    **Definition of Property Damage**

EnergyNorth next contends that "property damage" triggering policy coverage occurs whenever contaminants are released into the surface water, groundwater, or surrounding sediments from hazardous waste previously deposited at a site. Defendants respond that property damage only occurs in this kind of case when the hazardous waste is first deposited at the site. Thus, defendants argue that no property damage occurred while their policies were in effect because EnergyNorth had stopped disposing of coal tar at the site long before defendants' policies went into effect.

The New Hampshire Supreme Court has not addressed this issue. Courts in other jurisdictions, however, have reached differing conclusions. Some courts have held that the term "property damage" unambiguously refers only to the release of a harmful agent into the environment and not to the contamination that resulted from the release. See, e.g., Indiana Gas Co. v. Aetna Cas. & Sur. Co., 951 F. Supp. 767, 772-73 (N.D. Ind. 1996) (finding that in the context of an environmental-contamination insurance-coverage dispute, "property damage" refers only to the release of the harm-causing agent into the environment), judgment vacated on other grounds sub nom. Indiana Gas Co. v. Home Ins. Co, 141 F.3d 314 (7th Cir. 1998); Inland Waters Pollution

Control, Inc. v. National Union Fire Ins. Co., 997 F.2d 172, 187 (6th Cir. 1993) (same); SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 318 (Minn. 1995) (same). Other courts have acknowledged that the term can reasonably be interpreted in more than one way, including continuous, gradual injury to property resulting from prolonged exposure to contaminants — the interpretation proposed by EnergyNorth. See, e.g., Chemical Leaman Tank Lines, 817 F. Supp. at 1152-54 (finding that in the context of an environmental-contamination insurance-coverage dispute, "property damage" refers not only to the release of contaminants into the environment but also to the leaching or migration of contaminants into surrounding materials), cited in Public Serv. Elec. & Gas Co., 1994 U.S. Dist. LEXIS 21072, at *16-18; Montrose, 913 P.2d at 888, 890, 894 (same); cf. Keene Corp. v. Insurance Corp. of N. Am., 667 F.2d 1034, 1044-46 (D.C. Cir. 1981) (finding that in the context of an asbestosis insurance-coverage dispute, "bodily injury" refers not only to inhalation exposure to asbestos but also to exposure to asbestos already lodged in the lungs).

This issue is a difficult one to resolve, and it has not yet been adequately briefed. Accordingly, I decline to answer the question on the present record. Instead, I deny EnergyNorth's motion for partial summary judgment on this issue without prejudice to its right to renew the motion on a more fully developed record. As I cannot determine at the present time whether EnergyNorth's proposed interpretation of the phrase

29

"property damage" is correct, I likewise decline to determine whether any facts material to EnergyNorth's claim that property damage occurred in each policy period remain in dispute.

## IV. CONCLUSION

For the foregoing reasons, I hold that, with the exception of the American Home policies, (1) defendants' CGL policies all embody a continuous injury-in-fact trigger-of-coverage theory. I decline to determine the remaining issues on the present record. Accordingly, EnergyNorth's motion for partial summary judgment (document no. 128) is granted in part and denied in part without prejudice. American Home's individual motion for summary judgment (document no. 139) is denied without prejudice. To the extent that the other defendants' motions for summary judgment (document nos. 129, 135, 138 and 140) raise issues not resolved by this order, these motions too are denied without prejudice.[13]

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

September 30, 1998

_____

[13] Defendants have also submitted a joint motion to strike certain factual allegations made by EnergyNorth as not properly supported by affidavit (document no. 152). Because I do not rely on the contested information in reaching my decision, I deny the motion. Finally, Lloyd's has submitted a cross-motion for summary judgment with respect to the issues of fortuity, expectation, and intent (document no. 150). For reasons discussed above, I do not address these issues herein, and, thus, I deny the motion without prejudice.

cc:  Bruce Felmly, Esq.
     Robert Gallo, Esq.
     Vincent Ziccolella, Esq.
     Donald Uttrich, Esq.
     Emily Rice, Esq.
     Paul Leodori, Esq.
     John Putnam, Esq.
     Jeffrey Osburn, Esq.
     John Guarascio, Esq.
     Michael Aylward, Esq.